IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **M.A.B.,** *a minor,*<br>*by and through his parents and next friends,*<br>**L.A.B. and L.F.B.,**[1]<br><br>    *Plaintiff,*<br><br>    v.<br><br>**BOARD OF EDUCATION OF TALBOT**<br>**COUNTY,**<br>    12 Magnolia Street<br>    Easton, MD 21601,<br><br>**KELLY L. GRIFFITH,**<br>*in her official capacity as Superintendent of*<br>*Talbot County Public Schools,*<br>    Talbot County Public Schools<br>    12 Magnolia Street<br>    Easton, MD 21601,<br><br>**TRACY ELZEY,**<br>*in her official capacity as Principal of St.*<br>*Michaels Middle-High School,*<br>    St. Michaels Middle-High School<br>    200 Seymour Avenue<br>    St. Michaels, MD 21663,<br><br>    *Defendants.* | <br><br><br><br><br><br><br><br><br><br>Civil Action No. **1:16-cv-2622** |

**COMPLAINT**

M.A.B., a minor, by and through his parents and next friends, L.A.B. and L.F.B., and by

and through his counsel, Jer Welter, Esq., Laura McMahon DePalma, Esq., and FreeState

Justice, Inc., files this Complaint and in support states:

---

[1] Because Plaintiff is a minor child, he is identified in this Complaint only by his initials, as required by Fed. R. Civ. P. 5.2(a)(3). In the spirit of that rule, in order to avoid making Plaintiff easily identifiable from publicly-filed court documents, his parents (who share his last name) are also identified only by their initials, and the family's address is omitted. In a letter submitted *ex parte* along with this Complaint, Plaintiff is advising the Court and the Defendants of his and his parents' names, as well as their mailing address.

**Nature of the Action**

1.      This is an action to vindicate Plaintiff's right to non-discriminatory access to public educational facilities under Title IX of the Education Amendments of 1972, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Articles 24 and 46 of the Maryland Declaration of Rights.

2.      The Plaintiff, M.A.B., is a fourteen-year-old boy.  He is a student at St. Michaels Middle-High School in Talbot County, Maryland, where he will begin the Ninth Grade in the Fall of 2016.

3.      M.A.B. is transgender.  In other words, although at birth he was given a gender designation of female, that designation does not accurately reflect his gender identity—his deeply-held internal sense of his own gender—which is male.  M.A.B. has had feelings of gender dysphoria (*i.e.*, feelings of profound incongruence between one's gender designated at birth and one's gender identity) since early childhood, and arrived at his knowledge of his gender as a boy when he was in the Sixth Grade.

4.      Although St. Michaels Middle-High School and the Talbot County Public Schools system of which it is a part have taken certain steps to recognize M.A.B. as a boy, the school system has barred M.A.B. from using the sex-segregated boys' restrooms at the school for the bulk of the past school year, and has barred and continues to bar him from using the sex-segregated boys' locker room facilities at the school to change clothes before or after physical education classes and extracurricular athletic activities—thereby treating him differently from other students with respect to his sex, and giving rise to this action.

**Jurisdiction & Venue**

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because the action arises under federal law.  Specifically, plaintiff brings federal causes of action under Title IX of the Educational Amendments of 1972 ("Title IX"), codified as amended at 20 U.S.C. § 1681 *et seq.*; and the Fourteenth Amendment to the Constitution of the United States, enforceable against Defendants under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).  The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.  The Court may grant declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, and/or Rules 57 and 65 of the Federal Rules of Civil Procedure.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b), because the events giving rise to the action have occurred and are occurring in this district.

**Parties**

7.      M.A.B., Plaintiff, is a fourteen-year-old boy.  He is a citizen of Maryland and is domiciled and resides within this district in the Town of St. Michaels, in Talbot County, Maryland.  Because he is a minor child, he brings this action by and through his parents and next friends, L.A.B. and L.F.B., who are also citizens and domiciliaries of Maryland and residents of this district.  Plaintiff has been injured and is being injured by the Defendants' acts and omissions as set forth below.

8.      The Board of Education of Talbot County (the "Board"), Defendant, is a body politic and corporate established under Maryland state law, and vested with the control of all educational matters in Talbot County, Maryland, including the authority and responsibility to govern and maintain Talbot County's primary and secondary public school system.  *See* Md. Code, §§ 3-103, 3-104, 3-12A-01, 4-101, 4-108 of the Education Article ("Educ.").  The Board

consists of seven elected voting members, as well as non-voting student members from public high schools in the county. *See* Educ. §§ 3-114(a)(15) & 3-12A-01(a).

9.     The primary and secondary public school system in Talbot County, which is governed by the Board, is called Talbot County Public Schools ("TCPS"). TCPS does not have existence as a legal entity separate from the Board. References to "TCPS" in this Complaint include the Board. TCPS is an "education program or activity" within the meaning of Title IX.

10.     St. Michaels Middle-High School (sometimes referred to in this Complaint simply as the "School") is a public school in St. Michaels, Maryland, serving grades 6-12, and is part of the TCPS system. St. Michaels Middle-High School does not have existence as a legal entity separate from TCPS and the Board. References to "TCPS" in this Complaint include St. Michaels Middle-High School, and references to the "School" in this Complaint include TCPS and the Board. The School is an "education program or activity" within the meaning of Title IX.

11.     Dr. Kelly L. Griffith, Defendant, is the Superintendent of TCPS. She serves in that capacity by appointment by the Board, *see* Educ. § 4-201(b), and is *ex officio* the executive officer, secretary, and treasurer of the Board, although she is not a voting member of the Board. *See* Educ. § 4-102(a)(1), (c). As Superintendent, Dr. Griffith is responsible for all management of the TCPS system, subject to the oversight and direction of the Board, and the implementation and interpretation of the policies established by the Board. Dr. Griffith is sued solely in her official capacity as Superintendent of TCPS. Dr. Griffith acts and has acted as the agent of the Board and TCPS in carrying out the actions and policies alleged in this Complaint.

12.     Tracy Elzey, Defendant, is the Principal of St. Michaels Middle-High School. She reports to Dr. Griffith and is responsible for the management of the School, including implementation at the School of the policies and directives established by Dr. Griffith and the

Board.  Ms. Elzey is sued solely in her official capacity as Principal of St. Michaels Middle-High School.  Ms. Elzey acts and has acted as the agent of the Board and TCPS in carrying out the actions and policies alleged in this Complaint.

13.	The Board, TCPS, the School, Dr. Griffith, and Ms. Elzey (collectively, "Defendants") have injured and are injuring Plaintiff by their acts and omissions set forth below.

**Facts Giving Rise to This Action**

14.	M.A.B. is enrolled at St. Michaels Middle-High School.  He has attended the School since the Seventh Grade and will begin the Ninth Grade at the School in the upcoming Fall 2016 Semester.

15.	M.A.B.'s extracurricular interests include the sport of soccer.  He intends to try out for the School's soccer team (which is coeducational) in August 2016.

16.	In conjunction with trying out for and competing on the School's soccer team, as well as participating in physical education classes and other extracurricular athletic activities during the school year, M.A.B. requires access to locker room facilities at the School.

17.	Access to the locker room facilities for M.A.B. is necessary, not only to facilitate changing clothes before and after athletic activity, but also to participate in and benefit from team bonding activities and coaching that traditionally occur in a locker room setting.

18.	Like any other student, M.A.B. also requires restroom access periodically throughout the day when he is at School.

19.	The locker room facilities at the School, and most of its restroom facilities, are segregated by gender: there are locker rooms and restrooms designated separately for boys and for girls.

20.     M.A.B. is a transgender boy.  What this means is that his gender designated at birth was female, but that designation does not accurately reflect his gender identity—his deeply-held internal sense of his own gender—which is male.

21.     A person's gender designated at birth (*i.e.*, the "M" or "F" gender marker on the person's birth certificate) is usually based upon the appearance of the person's external genitalia at birth.  However, determinations of gender involve multiple factors, such as chromosomes, hormone levels, internal and external reproductive organs, and gender identity.

22.     Gender identity is the primary determinant of someone's gender, and of their "sex" within the meaning of Title IX and Article 46 of the Maryland Declaration of Rights.

23.     "Gender dysphoria" refers to the clinically significant distress that can be experienced by individuals whose gender identity differs from the gender they were designated at birth.  Gender dysphoria is a condition that has been recognized since 1980 in the Diagnostic & Statistical Manual of Mental Disorders, now in its Fifth Edition ("DSM-5"), published by the American Psychiatric Association, as well as by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.[2]

24.     The condition of gender dysphoria and the status of being transgender are not synonymous, but they are correlated, because many transgender people experience gender dysphoria—especially if they are unable to access appropriate medical care and/or to undertake non-medical steps to socially and legally transition to the gender with which they identify.

---

[2] In prior editions of the DSM, the same diagnosis was labeled "gender identity disorder" or "GID."  The label of the diagnosis was changed in the DSM-5 in order to focus on dysphoria —*i.e.*, the distress that may accompany the incongruence between one's gender identity and one's gender designated at birth—as the clinical problem, rather than identity per se.

25.    Treatment for gender dysphoria includes living consistent with one's gender identity (also known as "socially transitioning") in all aspects of one's life, including when accessing single-sex spaces like restrooms and locker rooms.

26.    M.A.B. has had feelings of gender dysphoria since early childhood.  He arrived at the clear realization that he is a boy when he was in the Sixth Grade.  M.A.B. received a clinical diagnosis of gender dysphoria in mid-2014.  Since that time, for approximately two years, he has regularly been seeing a therapist or psychologist regarding gender dysphoria and his process of gender transition.

27.    In the Fall of 2014, during M.A.B.'s Seventh Grade year, M.A.B. and his parents advised personnel at the School of M.A.B.'s gender identity.

28.    M.A.B. socially transitioned and "came out" as a boy and began going by a more traditionally masculine chosen first name (rather than the traditionally feminine name he was given at birth) later in that school year, on or about his thirteenth birthday in February 2015. With the support of his parents, he subsequently obtained a judicial decree recognizing his legal change of name to his chosen first name.

29.    M.A.B. has been generally accepted and recognized as male by his fellow students at the School since his transition, apart from a few instances of honest mistakes in which other students inadvertently used female gender pronouns (*e.g.*, she, her) or his former name to refer to M.A.B., and a single instance of such conduct done intentionally as a form of bullying by one other student (which was addressed by School personnel).

30.    To their credit, TCPS and the School took several steps to recognize and respect M.A.B.'s gender identity, including addressing him with male gender pronouns (*e.g.*, he, him, his) and by his chosen name wherever possible even before he legally changed his name.  The

School also conducted a professional development workshop for its staff in the Spring of 2015 on the topic of transgender students.

31.    However, TCPS prohibits M.A.B. from using the common male locker room facilities at the School and, until recently, for much of the past school year, also prohibited M.A.B. from using the common male restrooms at the School.

32.    Instead, TCPS has designated three single-occupancy restrooms in the School as "gender neutral," and has required M.A.B. to use these rooms for changing clothes for physical education class and other athletic activities and, until recently, for toilet usage.

33.    TCPS has also indicated that M.A.B. may use the communal female locker rooms and restrooms, but this is not a viable option because using the communal female facilities is stigmatizing, inappropriate, and socially awkward for both M.A.B. and the female users of those facilities, given that M.A.B. is male.

34.    Two of the single-occupancy restrooms are located immediately adjacent to each other, near the School's auditorium; the third is located in the school nurse's office.

35.    All three single-occupancy restrooms are remotely located from the School's gymnasium and its associated locker room facilities.  They are also remotely located from several other areas in the School that have easy access to communal male restrooms.

36.    None of the single-occupancy restrooms is equipped with benches, lockers, showers, or other facilities and equipment that are provided in the locker rooms.

37.    No student who is not transgender has been required to use the single-occupancy restrooms or been prohibited from accessing the communal locker rooms or restrooms associated with their gender.

38.     Using the designated single-occupancy restrooms makes M.A.B. feel humiliated, embarrassed, and alienated from other students; he reports that he received "weird looks" from other students when he uses the single-occupancy restrooms, and so he has tried to use them as infrequently and inconspicuously as possible.

39.     Having to use the single-occupancy restrooms also creates practical problems for M.A.B. that non-transgender students do not have to face. For instance, during the Fall 2015 Semester, M.A.B.'s 4th-period class was in Room 314, which is in a wing of the school where none of the single-occupancy restrooms is located.  There is a set of communal restrooms just around the corner from the classroom, and there are at least two more sets of communal restrooms in between Room 314 and the nearest single-occupancy restroom; it took too long to go the distance from the classroom to a single-occupancy restroom and back without risking discipline from a teacher for taking too long or being late to class, so M.A.B. had to "hold it."

40.     M.A.B. also has to leave the gym to change for physical education class or extracurricular athletic activities because he is not permitted to access the communal boys' locker room—in order to change, he has to visit both his student locker (located outside the gym, inside the school building proper) and one of the single-occupancy restrooms, which are not near each other.

41.     When M.A.B. took physical education class (in the Fall of 2015), the regular physical education teacher gave M.A.B. three minutes more than other students to reach the gymnasium changed and ready for class, because M.A.B. was required to change clothes in the single-occupancy restrooms.  However, on more than one occasion, when the physical education class was taught by a substitute teacher who was unaware of this accommodation, M.A.B. was

forced to explain his tardiness to the substitute teacher and disclose the fact that he is transgender to the substitute teacher in order to avoid discipline for tardiness.

42. Because of the stigma and impracticality of changing for physical education class in the single-occupancy restrooms, on days when M.A.B. did not anticipate that the physical education class would cause him to sweat profusely, he would sometimes attend physical education class without changing his clothes. On some of these occasions, M.A.B. had points deducted from his physical education grade for failure to change clothes for class.

43. M.A.B. and his parents communicated repeatedly with numerous TCPS personnel during the 2015-16 school year, including the then-Principal of the School, Dr. Helga Einhorn,[3] and the Superintendent, Dr. Griffith, in attempts to resolve the issue of restroom and locker room usage for M.A.B. M.A.B. also contacted TCPS through counsel in attempting to resolve this issue. Despite these efforts, TCPS maintained its position unchanged throughout most of the 2015-16 school year.

44. On April 19, 2016, the United States Court of Appeals for the Fourth Circuit issued its decision in *G.G. ex rel. Grimm v. Gloucester County School Board*, 822 F.3d 709 (4th Cir. 2016), *reh'g en banc denied*, ___ F.3d ___, 2016 WL 3080263, 2016 U.S. App. LEXIS 9909 (4th Cir. May 31, 2016). The plaintiff in *G.G.*, a transgender boy who is a student at a public high school in Virginia, challenged under Title IX and the Fourteenth Amendment a school policy similar to the one at issue here, restricting him to use of a single-occupancy restroom. (Because G.G. did not participate in physical education classes or extracurricular athletic activities at the school, he had not sought access to the boys' locker rooms, and so access

---

[3] At the completion of the 2015-16 school year, Dr. Einhorn was promoted to Assistant Superintendent for Instruction at TCPS, and Defendant Elzey was appointed to succeed Dr. Einhorn as Principal of the School.

to restrooms was the only issue before the Court.  *See G.G.*, 822 F.3d at 715 n.2.)  In its decision

in *G.G.*, the Fourth Circuit considered the U.S. Department of Education's interpretation of its

own Title IX regulations—to the effect that "'[w]hen a school elects to separate or treat students

differently on the basis of sex'" by providing sex-segregated toilet, locker room, or shower

facilities as permitted by the Department's Title IX regulations, "'a school generally must treat

transgender students consistent with their gender identity.'"" *Id.* at 718 (quoting Dept. of Ed.

opinion letter).  The Fourth Circuit held that the Department's interpretation of its regulations is

"entitled to *Auer* [*v. Robbins*, 519 U.S. 452 (1997),] deference and is to be accorded controlling

weight . . . ."  *Id.* at 723.  Accordingly, the Fourth Circuit reversed the district court's dismissal

of G.G.'s Title IX claim and the district court's denial of a preliminary injunction that would

require the school to permit G.G. to access the common male restrooms.

45.    On or about April 25, 2016, in light of the *G.G.* decision, counsel for TCPS

advised Plaintiff's counsel that "although TCPS intends to permit [M.A.B.] to use restrooms

based on his gender identity, it will continue to require him to use locker rooms based on his

birth sex.  Should he choose to do so, [M.A.B.] may also continue to use any of the gender-

neutral restrooms in lieu of using either the single-sex restrooms or locker rooms."  TCPS based

its continued refusal to allow M.A.B. to access the locker rooms consistent with his gender on

the fact that the *G.G.* case had not involved locker rooms.  Then-Principal Einhorn personally

advised M.A.B. and his parents of this decision on or about May 13, 2016 (by that point, M.A.B.

had already begun using the boys' restrooms at the School based on the earlier communication

from TCPS's counsel).

46.    On May 13, 2016, the United States Department of Education and Department of

Justice jointly issued a "Dear Colleague" letter, further confirming and clarifying the

requirements of Title IX and its implementing regulations with respect to transgender students.[4]

With regard to "Restrooms and Locker Rooms" (which the Dear Colleague letter treats

indistinguishably), the letter states:

> A school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity. A school may not require transgender students to use facilities inconsistent with their gender identity or to use individual-user facilities when other students are not required to do so. A school may, however, make individual-user options available to all students who voluntarily seek additional privacy. (Endnotes omitted.)

47.     Despite the Dear Colleague letter and repeated requests from Plaintiff, TCPS

continues to prohibit M.A.B. from accessing the boys' locker room facilities at the School.

48.     The communal boys' locker room at the School includes stalls that are

partitioned, or are capable of being partitioned, such that any student who wishes to disrobe in

greater privacy from other students could do so. In addition, the toilet facilities within the boys'

locker room are partitioned into private stalls that each have a stall door.

49.     No other male students have expressed to M.A.B. any discomfort with the

prospect of his using the boys' locker room facilities; to the contrary, many of M.A.B.'s fellow

students (both male and female) have congratulated him on gaining the right to access the boys'

restrooms in the wake of the *G.G.* decision.

50.     The extracurricular soccer season is due to start imminently, with tryouts

commencing on or about August 10, 2016.

---

[4] The "Dear Colleague" letter is available at: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

**Claims for Relief**

**Count I:**
**Title IX of the Education of Amendments of 1972 (20 U.S.C. § 1681 *et seq.*)**

51.     The foregoing paragraphs are incorporated as if fully set forth herein.

52.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

53.     Title IX by its statutory text admits no exception that would permit sex segregation in spaces such as locker rooms or restrooms at all.  However, Title IX directs each federal agency that administers federal financial assistance for "education programs[s] or activit[ies]" to effectuate the statute by "issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance," and by withholding financial assistance on the basis of noncompliance with such regulations.  20 U.S.C. § 1682.

54.     In the exercise of that authority, the United States Department of Education has issued a regulation that authorizes providing "separate toilet, locker room, and shower facilities on the basis of sex," so long as "such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.  The regulation does not specifically indicate how it is to be applied with regard to students who are transgender.

55.     In a series of actions over several years, including but not limited to the opinion letter cited in *G.G.*, *see* ¶ 44 *supra*, and the recent Dear Colleague letter cited in Paragraph 46 *supra*, the U.S. Department of Education has made clear that, in order to comply with Title IX, a

covered educational program must give transgender students access to the sex-segregated facilities that 34 C.F.R. § 106.33 authorizes on the basis of the students' gender identity.  This is consistent with the view of the federal government generally and of numerous courts (including this Court, *see Finkle v. Howard County*, 12 F. Supp. 3d 780, 788 (D. Md. 2014)) that subjecting a person to differential treatment because they are transgender is a form of discrimination "on the basis of sex" within the meaning of Title IX and other laws prohibiting sex discrimination.

56.     Under the Fourth Circuit's decision in *G.G.*, the Department of Education's interpretation of Title IX and 34 C.F.R. § 106.33 is entitled to controlling deference.

57.     Under Title IX, discrimination "on the basis of sex" encompasses discrimination based on biological differences between men and women, discrimination based on gender nonconformity, and discrimination against a person because they are transgender.

58.     TCPS and the School are "education programs or activities" that receive "Federal financial assistance" within the meaning of Title IX.

59.     By requiring M.A.B., a transgender boy, to use separate restrooms, instead of the locker room and restroom facilities made available to other students, because he is transgender, the Defendants have excluded and continue to exclude M.A.B. from participation in, deny him the benefits of, and subject him to discrimination in education programs and/or activities on the basis of sex in violation of Title IX.

60.     By refusing to allow M.A.B., a transgender boy, to access boys' restrooms and boys' locker rooms because Defendants do not deem him to be male, the Defendants have excluded and continue to exclude M.A.B. from participation in, deny him the benefits of, and subject him to discrimination in education programs and/or activities on the basis of sex in violation of Title IX.

**Count II:**
**Equal Protection Clause of the Fourteenth Amendment to**
**the Constitution of the United States**

61.     The foregoing paragraphs are incorporated as if fully set forth herein.

62.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on gender is presumptively unconstitutional and subject to heightened scrutiny.  The Fourteenth Amendment's protections from discrimination based on gender encompass discrimination based on the biological differences between men and women, discrimination based on gender nonconformity, and discrimination against a person because they are transgender.

63.     By requiring M.A.B., a transgender boy, to use separate restrooms, instead of the locker room and restroom facilities made available to other students, because he is transgender, the Defendants have treated and continue to treat M.A.B. differently based on his gender.

64.     By refusing to allow M.A.B., a transgender boy, to access boys' restrooms and boys' locker rooms because Defendants do not deem him to be male, the Defendants have treated and continue to treat M.A.B. differently based on his gender.

65.     The Defendants' discrimination against M.A.B. based on his gender is not substantially related to any important government interest.

66.     The Defendants' discrimination against M.A.B. based on his gender is not rationally related to any legitimate government interest.

67.     The Defendants' discrimination against M.A.B. based on his gender denies him the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution.

68.     The Defendants' acts as alleged above have been performed under color of state law, but exceed Defendants' lawful authority because they violate the Fourteenth Amendment.

**Count III:**
**Article 24 of the Maryland Declaration of Rights**

69.     The foregoing paragraphs are incorporated as if fully set forth herein.

70.     Article 24 of the Maryland Declaration of Rights provides that a person may not be "disseized of his . . . liberties or privileges . . . but by the judgment of his peers, or by the Law of the land." The Maryland Court of Appeals has held that the rights protected by Article 24 encompass a right to equal protection of the laws that is generally coextensive with the equivalent right established by the Equal Protection Clause of the Fourteenth Amendment.

71.     The Defendants' differential treatment of M.A.B. based on his gender, as alleged above, denies him the equal protection of the laws, in violation of Article 24.

**Count IV:**
**Article 46 of the Maryland Declaration of Rights**
**Equal Rights Amendment ("ERA")**

72.     The foregoing paragraphs are incorporated as if fully set forth herein.

73.     Article 46 of the Maryland Declaration of Rights, known as the Equal Rights Amendment ("ERA"), provides: "Equality of rights under the law shall not be abridged or denied because of sex." Under the ERA, distinctions based on gender are subject to strict scrutiny.

74.     The Defendants' differential treatment of M.A.B. because he is transgender, as alleged above,  abridges and denies him equality of rights under the law because of sex, in violation of the ERA.

75.     The Defendants' differential treatment of M.A.B. because they do not deem him to be male, as alleged above, abridges and denies him equality of rights under the law because of sex, in violation of the ERA.

**Request for Relief**

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court:

A.      Enter a judgment declaring that Defendants' policies of refusing to allow M.A.B. to access the boys' restrooms and locker rooms at the School to the same extent and on the same terms as other male students violate his rights under Title IX, the Fourteenth Amendment, and Articles 24 and 46;

B.      Enter a temporary restraining order and preliminary and permanent injunctive relief requiring Defendants to allow M.A.B. to access the boys' restrooms and locker rooms at the School to the same extent and on the same terms as other male students;

C.      As to Counts I, III, and/or IV, award M.A.B. nominal and compensatory damages in amounts to be determined by the Court (but, as to Count III or Count IV, no greater than $100,000), payable by the Board of Education of Talbot County (money damages are not sought against any defendant other than the Board);

D.      Award Plaintiff his reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

E.      Grant such other and further relief as justice requires.

Date: July 19, 2016                                    Respectfully submitted,


                                                       /s/ Jer Welter
                                                       Jer Welter, Esq.
                                                         D. Md. Bar No. 29565
                                                       Laura McMahon DePalma, Esq.
                                                         D. Md. Bar No. 19526
                                                       FreeState Justice, Inc.
                                                       231 East Baltimore Street, Suite 1100
                                                       Baltimore, MD 21202
                                                       t: (410) 625-5428
                                                       f: (410) 625-7423
                                                       e: jwelter@freestate-justice.org
                                                       e: ldepalma@freestate-justice.org

                                                       *Attorneys for Plaintiff*