# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**M.A.B.,** *a minor,*
*by and through his parents and next friends,*
**L.A.B. and L.F.B.,**

    *Plaintiff,*

    v.

**BOARD OF EDUCATION OF TALBOT COUNTY,** *et al.,*

    *Defendants.*

Civil Action No. **GLR-16-2622**

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Jennifer L. Kent, Esq.
D. Md. Bar No. 28870
Laura McMahon DePalma, Esq.
D. Md. Bar No. 19526
FreeState Justice, Inc.
231 East Baltimore Street, Suite 1100
Baltimore, MD 21202
t: (410) 625-5428
f: (410) 625-7423
e: jkent@freestate-justice.org
e: ldepalma@freestate-justice.org
*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ..................................................................................1

II.     FACTS…...............................................................................................................2

III.    ARGUMENT.........................................................................................................5

        A.      When A School System Denies A Transgender Boy Access To Its
                Locker Rooms And Restrooms That Are Consistent With His
                Gender Identity, It Impermissibly Discriminates On The Basis Of
                Sex Under Title IX. .................................................................................5

                1.      Discrimination based on a Person's Transgender Status is
                        "discrimination on the basis of sex" Prohibited by Title IX .....................7

                2.      Neither Title IX nor its Regulations Require that the Term
                        "Sex" Should be Construed to be Limited to Biological
                        Sex. ...............................................................................11

                        i.      *The Defendants Reading of "Sex" is Incorrect.* .....................11

                        ii.     *Reading Title IX's Regulations in a Manner*
                                *Consistent with Title IX Requires that M be*
                                *Granted Access to the Boys Locker Rooms*..............................15

        B.      M has Sufficiently Plead Facts to Allege that the Defendants are Discriminating
                Against Him in Violation of Federal and Maryland Equal Protection
                Constitutional Guarantees..........................................................................20

                1.      Discrimination Against Transgender People is Cognizable
                        Sex Discrimination Under State and Federal Equal
                        Protection Provisions. ..........................................................21

                2.      Discriminating Against Transgender Students to Address
                        the Hypothetical Privacy Concerns of Other Students is not
                        Substantially Related to an Important Government Interest...................24

                3.      Even if the Court Applied Rational Basis Review, the
                        Defendants' Actions Would not Survive Scrutiny. ...............................31

        C.      M has Sufficiently Plead Facts to Allege that Defendants have Violated his
                Rights Under Maryland's Equal Rights Amendment...........................................32

IV. CONCLUSION.....................................................................................................34

i

Plaintiff, M.A.B., by and through undersigned counsel and pursuant to Local Rule 105.2, hereby submits this Memorandum in Opposition to Defendants' Motion to Dismiss and states in support thereof as follows:

## I.   PRELIMINARY STATEMENT

Plaintiff, M.A.B. (hereinafter "M") is a fifteen-year-old transgender boy. M is the only student at St. Michaels Middle High School who the defendants have barred from using the locker rooms—and for over a year, the restrooms—consistent with his gender identity. Instead, M' only options are to use the girls' locker room (no choice at all for a fifteen-year-old boy) or to change clothes in ill-equipped unisex bathrooms far away from the school gym.  As discussed in further detail herein, M has more than amply alleged that the defendants here have violated Title IX, federal and Maryland Equal Protection constitutional guarantees, and Maryland's Equal Rights Amendment.

Courts around the country have agreed that both Title IX and the Equal Protection provisions of the Fourteenth Amendment prevent public school officials from barring transgender students from traditionally sex segregated facilities that conform to their gender identity. In their motion to dismiss, defendants do not even attempt to grapple with the weight of this precedent.  Instead, they proffer that M is excluded from both Title IX and state and federal constitutional protections because those rights only encompass discrimination based on sex.  And although they have barred M from the boys' locker rooms and restrooms solely because his gender identity does note align with the sex he was assigned at birth, the defendants nevertheless claim that their conduct is not sex discrimination.  They also seek to defeat M's valid Equal Protection claim by constructing a non-existent constitutional right to bodily privacy in ordinary locker room activity.

As explained in further detail below, for this Court to accept the defendants' reading of Title IX and the constitutional rights at issue would effectively write the rights of transgender people out of existence.  The defendants' reading does not comport with the objectives of Title IX, Equal Protection, or Maryland's Equal Rights Amendment. For all of these reasons, the Motion to Dismiss should be denied.

## II.    FACTS[1]

M is a fifteen-year-old student at St. Michaels Middle High School ("School") in Talbot County, Maryland.  As defendants acknowledge in their Motion to Dismiss, M is a transgender boy: "although at birth he was given a gender designation of female, that designation does not accurately reflect his gender identity—his deeply-held internal sense of his own gender—which is male."  (Compl. ¶ 3.)  A person's gender designated at birth (i.e., the "M" or "F" gender marker on the person's birth certificate) is usually based upon the appearance of the person's external genitalia at birth.  Determinations of gender involve multiple factors, such as chromosomes, hormone levels, internal and external reproductive organs, and gender identity. (Compl. ¶ 21.)  However, "gender identity is the primary determinant of someone's gender[.]" (Compl. ¶ 22.)

M experienced "gender dysphoria" (the clinically significant distress that can be experienced by individuals whose gender identity differs from the gender they were designated at birth) since "early childhood."  (Compl. ¶¶ 23, 26) Many transgender people experience

---

[1] The facts alleged in the Complaint must be taken as true on both a motion to dismiss and construed in a light most favorable to M. *See Schindler Elev. Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 n.2 (2011); *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976). The Court may also consider facts subject to judicial notice, which "are deemed to be a part of every complaint by implication." 11A Wright & Miller, et al., Fed. Prac. & Proc. Civ. § 1357 (3d ed. 2015); *see Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986).

gender dysphoria—especially if they are unable to access appropriate medical care and/or to undertake non-medical steps to socially and legally transition to the gender with which they identify.  And "treatment for gender dysphoria includes living consistent with one's gender identity (also known as "socially transitioning") in all aspects of one's life, including when accessing single-sex spaces like restrooms and locker rooms."  (Compl ¶ 24.)

Clearly realizing he was a boy in the sixth grade, when M turned thirteen (in February 2015), in line with recognized standards of care for transgender people, he began to socially transition to live life as male.  (Compl. ¶¶26-27.) He began going by a traditionally masculine chosen first name, and with the support of his parents, obtained a judicial decree changing his name to his chosen name.  (Compl ¶ 28.)   M "has been generally accepted and recognized as male by his fellow students at the School since his transition[.]" (Compl. ¶28.)  Indeed, when M was eventually allowed to use the boys' restroom, many of his fellow students congratulated him.  (Compl. ¶ 49.)

Though taking certain steps in response to M's gender transition (*e.g.*, a staff training and using appropriate pronouns and M's chosen name), defendants have nevertheless barred M from the School's locker rooms, and for over a year during the initial period of M's transition, from the School's restrooms.   (Compl. ¶¶30-31.)  This is despite the fact that the boys' locker room is equipped with "stalls that are partitioned, or are capable of being partitioned, such that any student who wishes to disrobe in greater privacy from other students could do so. In addition, the toilet facilities within the boys' locker room are partitioned into private stalls that each have a stall door." (Compl ¶ 48.)

Instead, defendants "designated three single-occupancy restrooms in the School as 'gender neutral,'" for M's use.  (Compl ¶ 32.) All three of the single-occupancy restrooms are far

3

away from the School's gymnasium and its associated locker rooms. They are also far away from several other areas in the School that have easy access to communal male restrooms. (Compl. ¶ 35.) Additionally, none of the single-occupancy restrooms have benches, lockers, showers, or other equipment common to a locker room. (Compl. ¶ 36.) Unlike any other boy in the School whose gender identity is male, M must use these rooms to change clothes for "physical education class and other athletic activities and, until recently, for toilet usage." (Compl. ¶ 32.) Indeed, no student who is not transgender has been required to use the single-occupancy restrooms or been prohibited from accessing the communal locker rooms or restrooms associated with their gender. (Comp. ¶ 37.)

Using the designated restrooms is stigmatizing and humiliating for M: he has received "weird looks" from other students when using the single-occupancy restrooms, and so he has tried to use them as infrequently and inconspicuously as possible. (Compl. ¶ 38.) And at times the location of the designated restrooms has simply been too far away for M to use the facility without risking discipline from a teacher for taking too long or being late to class. In those instances, M was forced to hold in his basic bodily functions. (Compl. ¶ 39.) M also has had to leave the gym to change for physical education class or extracurricular athletic activities because he is not permitted to access the communal boys' locker room—in order to change, he has to visit both his student locker (located outside the gym, inside the school building proper) and one of the single-occupancy restrooms, which are not near each other. (Compl. ¶ 40.) Given the length he has to travel to simply change clothes for gym, at times M has been forced to explain his tardiness to substitute gym teachers by disclosing the fact that he is transgender. (Compl. ¶ 41.) Because of the stigma and impracticality of changing for physical education class in the single-occupancy restrooms, on days when M did not anticipate that the physical education class

4

would cause him to sweat profusely, he would sometimes attend physical education class without changing his clothes.  On some of these occasions, M had points deducted from his physical education grade for failure to change clothes for class.  (Compl. ¶ 42.)

M was only granted access to the School's restrooms in April 2016, after the Fourth Circuit issued its decision in *G.G. ex rel. Grimm v. Gloucester County School Board*, 822 F.3d 709 (4th Cir. 2016) [hereinafter "the *G.G.* case" or "*G.G.*"].[2] (Compl. ¶ 46.)  The defendants continue to bar him from the School's male locker rooms. (Compl. ¶ 48.)

However, "no other male students have expressed to M any discomfort with the prospect of his using the boys' locker room facilities; to the contrary, many of M's fellow students (both male and female) have congratulated him on gaining the right to access the boys' restrooms in the wake of the G.G. decision." (Compl. ¶ 49.)  Further facts as necessary for the resolution of the issues herein shall be laid out as necessary.

## III.    ARGUMENT

**A.    When A School System Denies A Transgender Boy Access To Its Locker Rooms And Restrooms That Are Consistent With His Gender Identity, It Impermissibly Discriminates On The Basis Of Sex Under Title IX.**

---

[2] Defendants submit that the restroom issue is moot since they have now temporarily granted M access to the boys' restroom. (ECF 36-1 at * 10).   However, the "voluntary discontinuance of challenged activities by a defendant does not necessarily moot a lawsuit." *United States v. Jones,* 136 F.3d 342, 348 (4th Cir.1998). A "narrow" exception lies when there is "*no* reasonable expectation that the wrong will be repeated," which defendants "face a heavy burden" to establish. *Lyons P'Ship, L.P. v. Morris Costumes, Inc.,*243 F.3d 789, 800 (4th Cir.2001). Here, the defendants have not even argued that the exception applies, much less put forth any evidence. Nor could they, since they have only allowed M access "for the pendency of the litigation." (ECF 36-1 at *10.)  Additionally, defendants disregard that M has also included a claim for money damages for the humiliation and physical harm resulting from the defendants' past conduct, which is not moot. *Henson v. Honor Comm. of the Univ. of Va.,* 719 F.2d 69, 72 n. 5 (4th Cir.1983) (noting that the dropping of disciplinary charges did not moot plaintiff's due process claim because the plaintiff also sought nominal damages).

Title IX "proscribes gender discrimination in education programs or activities receiving federal financial assistance." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 514 (1982).   The statute provides, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

The Supreme Court has "consistently interpreted Title IX's private cause of action *broadly* to encompass diverse forms of intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183, (2005) (emphasis added); *see also Bell*, 456 U.S. at 512 ("There is no doubt that if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.") (internal quotation omitted) (alteration in original)).  In construing Title IX, the Fourth Circuit has repeatedly looked to "case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX." *G.G.*, 822 F.3d at 718.

As discussed below, M has asserted a claim under Title IX because he has alleged sufficient facts to demonstrate that the defendants treat him differently from other boys on the basis of sex, including his gender identity, nonconformity to male stereotypes (*i.e.*, that he was not assigned male at birth and may have certain physical features different from other boys), and transgender status.[3]  Additionally, the defendants' differential treatment has resulted in ongoing educational, emotional, and physical harms to M, which have denied and continue to deny him

---

[3] Defendants claim that M is barred from asserting claims for injunctive relief against Elzey and Griffith because "there is no individual liability under Title IX." (ECF 36-1 at * 11, n.12 (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009)). Even assuming *arguendo*  that there would be some basis to limit the assertion of monetary claims to educational entities (*i.e.,* Title IX grant recipients) under Title IX, it should not limit a plaintiff's ability to seek injunctive relief to ensure that those who manage and govern that same entity comply with the statute.

6

the full benefits of the education program and activities offered by the School to its students.

(*See* Section II, *supra with* Compl. ¶¶ 54, 57-60.) These allegations alone are more than

sufficient to survive a motion to dismiss.

**1.    Discrimination based on a Person's Transgender Status is "discrimination on the basis of sex" Prohibited by Title IX.**

It is by now well-established that the phrase "based on sex," as articulated in the federal

civil rights laws, prohibits a broad range of discriminatory practices based both on sex and

gender. "[B]ased on sex" does not, as older cases suggested, include only "discriminat[ion]

against women because they are women and against men because they are men." *Ulane v.*

*Eastern Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) *overruled by Hively v. Ivy Tech Cmty.*

*College of Ind.,* 853 F.3d 339 (7th Cir. 2017) (holding that discrimination based on "sex" in Title

VII actions encompassed discrimination based on sexual orientation).

For instance, in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), Supreme Court held

that the plaintiff, a woman denied a promotion because her colleagues perceived her to be too

masculine, stated a claim under Title VII because that denial was based on gender stereotyping.

*Id.* at 250-251 (plurality opinion). Writing for the plurality, Justice Brennan explained "assuming

or insisting that [individual men and women] match[ ] the stereotype associated with their group"

is discrimination because of sex. *Id.* at 251.  And in *Oncale v. Sundowner Offshore Services,*

*Inc.*, the Supreme Court held that male-on-male sexual harassment was a cognizable claim under

Title VII. 523 U.S. 75, 79 (1998), although it was certainly not "the principal evil Congress was

concerned with when it enacted Title VII."

In line with the Supreme Court cases above, "the First, Sixth, Ninth, and Eleventh

Circuits have all recognized that discrimination against a transgender individual based on that

person's transgender status is discrimination because of sex under federal civil rights statutes and

7

the Equal Protection Clause of the Constitution." *G.G. v. Gloucester Cty. Sch. Bd.*, 654 Fed. Appx. 606, 607 (4th Cir. 2016) (Davis, J., concurring) (citing *Glenn v. Brumby*, 663 F.3d 1312, 1316-19 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 573-75 (6th Cir.2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 22 215-16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-03 (9th Cir. 2000)).

A person's transgender status is an inherently sex-based characteristic. M is being treated differently because he is a boy who was identified as female at birth. The incongruence between his gender identity and his sex identified at birth is what makes him transgender. Treating a person differently because of the relationship between those two sex-based characteristics is literally discrimination "on the basis of sex." *See, e.g., Fabian v. Hosp. of Cent. Conn.,* 172 F. Supp. 3d 509, 527 (D. Conn. 2016) ("[D]iscrimination … on the basis of being transgender, or intersex, or sexually indeterminate, constitutes discrimination on the basis of the properties or characteristics typically manifested in sum as male and female—and that discrimination is literally discrimination 'because of sex.'"); *Schroer v. Billington*, 577 F. Supp. 2d 293, 305-06 (D.D.C. 2008) (holding an employer's refusal to hire transgender employee upon learning that "she planned to change her anatomical sex by undergoing sex reassignment surgery was *literally* discrimination 'because of . . . sex'").

Additionally, discrimination against transgender people is sex discrimination because it impermissibly rests on sex stereotypes and gender-based assumptions.  For instance, in the District of Maryland, we have already recognized in the context of Title VII that, "any discrimination against transsexuals (as transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is … discrimination on the basis of sex as interpreted by *Price Waterhouse*." *Finkle v. Howard County*, 12 F. Supp. 3d 780, 788 (D. Md. 2014).  As the

Eleventh Circuit observed in *Glenn v. Brumby*, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. . . . There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms." 663 F.3d at 1316.

The overwhelming majority of district courts to consider the question have found that transgender individuals are protected from discrimination "on the basis of sex" under federal sex discrimination laws on one or both of these understandings of "sex." *See, e.g., Evancho.*, ---F.Supp.3d ----, 2017 WL 770619 at *19 (collecting Title IX and Title VII cases) (concluding "[i]n light of the most recent, broader readings of the term 'sex' . . . the Plaintiffs have a reasonable likelihood of showing that Title IX's prohibition of sex discrimination includes discrimination as to transgender individuals based on their transgender status and gender identity.").[4] And courts across the country have recognized that excluding transgender boys and girls from sex segregated facilities that comport with their gender identity such as restrooms subjects them to discrimination on the basis of sex. See *Evancho*, 2017 WL 770619 at *19 (equal protection); *Highland*, 208 F. Supp. 3d at 865-77 (Title IX and equal protection), *Whitaker v.*

---

[4] The *Evancho* court, though granting plaintiffs' motion for a preliminary injunction on equal protection grounds, nevertheless denied the portion of the motion requesting that an injunction issue under Title IX. The court noted that the Department of Education ("DOE") had recently issued a Dear Colleague Letter rescinding the guidance at issue in *G.G.* (the "2017 Dear Colleague Letter") and that at that time, the case was still pending before the Supreme Court, who would presumably rule on the issue. The court explained that due to the momentary "uncertainty" on the issues, that it was "not in a position to conclude which party in this case has the likelihood of success on the merits of that statutory claim." 2017 WL 770619 at * 22. As discussed *infra*, the Supreme Court has now remanded the *G.G.* case back to the Fourth Circuit. The latest proclamation from the panel there contained a concurrence by Judges Floyd and Davis strongly in support of Gavin Grimm's right to equal treatment under Title IX.

*Unified Sch. Dist. 1*, No. 16–CV–943–PP, 2016 WL 5239829, at *1 (E.D. Wisc. Sept. 22, 2016) (same).[5]

In other words, discrimination based on "sex," "sex stereotyping," "gender transition/change of sex," and "gender identity" are "simply different ways of stating the same claim of discrimination 'based on . . . sex.'" *Macy v. Holder*, EEOC Appeal No. 0120120821, 2012 WL 1435995, at *5 (EEOC Apr. 20, 2012) (discrimination against transgender person is discrimination based on sex under Title VII). Nor is this reality unusual or limited to sex-based discrimination.  By way of comparison, Supreme Court has recognized that race-based discrimination is not limited to discrimination based skin color, but also includes discrimination on the basis of racial affiliation and association, such as interracial friendships or intermarriage. *Bob Jones Univ. v. U.S.*, 461 U.S. 574, 605 (1973).

Here, consistent with the weight of these decisions, M has a clear claim of discrimination "on the basis of sex." To the defendants, M cannot be treated like other boys because he was designated "female" at birth. They have thus barred him from the School's locker rooms and instead relegated him to inadequate single-stall changing rooms because he does not conform to their traditional notions of what a boy should be: one who was assigned the "male" at birth and who has certain physical characteristics, including male genitals and secondary sex characteristics. The defendants' narrow conception of boyhood does not allow for the proposition that, despite these differences, as a boy recognized by his family, doctors, friends,

---

[5] *Evancho*, *Highland*, and *Whitaker* all involved restroom access.  However, the simple request for locker room access "does not mean that . . . that those additional facility uses would or would not lead to a different result[.]" *Evancho*, 2017 WL 770619, *14 n.34.  And indeed, as discussed *infra*, both the law and facts here compel the result that M is entitled to be treated like every other student at his School and should be granted access to the boys' locker rooms.  Especially, where as here, privacy safeguards already exist or can readily be made available for those students who desire greater privacy.

and others, M is entitled under Title IX to be treated fully as male at school. Whether conceptualized as based on sex stereotyping, gender nonconformity, gender identity, or transgender status, the defendants' conduct comfortably fits within the plain language of Title IX: M has been discriminated against "on the basis of sex."

**2.      Neither Title IX nor its Regulations Require that the Term "Sex" Should be Construed to be Limited to Biological Sex.**

The defendants do not even attempt to grapple with the weight of decisions that have held that discrimination on the basis of "sex," whether in the context of Title IX, or relevant non-discrimination statutes like Title VII, encompasses discrimination against transgender people. Instead, couching their position as a matter of statutory construction, the defendants incorrectly claim that because the statutory/regulatory term, "sex," does not expressly include "gender identity," Title IX simply "does not prohibit discrimination or distinctions based on gender identity[.]" (ECF 36-1 at * 18.)  Additionally, the defendants claim that excluding transgender students from locker rooms that conform to their gender identity is permissible because Title IX's implementing regulations, which do not mention gender identity, permit schools to "provide separate toilet, locker room, and shower facilities on the basis of sex" so long as the "facilities provided for students of one sex" are "comparable to facilities provided for students of the other sex." 34 C.F.R. § 106.33; 28 C.F.R. § 54.410 [hereinafter "the Regulation"].

> ### i.      *The Defendants Reading of "Sex" is Incorrect.*

The defendants first advise that the "plain language" of the term sex should be read in line with what they claim was virtually the exclusive dictionary definition of that term at the time: "the *physiological* distinctions between males and females, particularly with respect to their reproductive functions." (ECF 36-1 at *13.)  Unfortunately for the defendants, the *majority* of the Fourth Circuit came to the opposite conclusion in *G.G.*: "*the definitions also suggest that a*

11

*hard-and-fast binary division on the basis of reproductive organs—although useful in most cases—was not universally descriptive.* The *dictionaries, therefore, used qualifiers* such as reference to the "sum of" various factors, "typical dichotomous occurrence," and "typically manifested as maleness and femaleness." 822 F.3d at 721-22 (emphasis added); *see also Highland*, 208 F.Supp. 3d at 866 ("Suffice it to say that dictionaries from that era defined "sex" in myriad ways and, therefore, [the school district] has not persuaded the Court that dictionary definitions reflect a uniform and unambiguous meaning of "sex" as biological sex or sex assigned at birth."); *Fabian,* 172 F. Supp. 3d at 526 (explaining that "sex" has never been merely defined as simple male/female dichotomy).

To the extent the defendants suggest that this Court should elevate reproductive functions above all others in construing the term "sex," the Fourth Circuit aptly noted some of the many interpretive problems with that approach in *G.G.:*

> For example, which restroom would a transgender individual who had undergone sex- reassignment surgery use? What about an intersex individual? What about an individual born with X–X–Y sex chromosomes? What about an individual who lost external genitalia in an accident?

Additionally, if as defendants suggest, sex is determined by the sex assigned at birth (based, presumably on reproductive anatomy), then Title IX claims by transgender children would never be cognizable. *See, e.g., Ulane v. Eastern Airlines, Inc*., 742 F.2d 1081, 1085 (7th Cir. 1984) (holding claims of transgender people excluded from Title VII because it is not discrimination based on sex) *overruled by Hively v. Ivy Tech Cmty. College of Ind.,*  853 F.3d 339 (7th Cir. 2017). Nor, as the defendants admit, would discrimination against students based on their sexual orientation be prohibited by Title IX. (*See* ECF 36-1 at * 13.) Certainly, assuming *arguendo* that any portion of the 2017 Dear Colleague Letter is to be given any effect, this would at the very

12

least improperly run afoul of the directive that "[a]ll schools must ensure that all students, including LGBT students, are able to learn and thrive in a safe environment[,]" to say nothing of the years of DOE guidance advising that Title IX protects all students, including transgender and gender-nonconforming students from sex discrimination.[6] Under that reading, the defendants could lawfully do more than just restrict or surveil M's restroom/locker room use: they could expel him and all other transgender students from school altogether, for any reason or no reason at all, without running afoul of Title IX.  They could do the same for gay, lesbian or bisexual students.  That breathtaking result is not consistent with Title IX's plain text, Title IX's broad purpose of giving individuals the right to challenge gender-based discrimination, or the Supreme Court's case law construing Title IX broadly. It also would raise serious constitutional questions that can be avoided by giving Title IX its better reading.

Still further, as a fundamental matter of statutory interpretation, that Congress may not have had gender identity on its radar when enacting Title IX is of no consequence.[7]  As Justice Scalia explained on behalf of a unanimous Court in *Oncale*: "[S]tatutory prohibitions often go

---

[6] DOE has advised that transgender students are protected from sex discrimination under Title IX in a variety of contexts since 2010.  *See, e.g.,* OCR, Questions & Answers on Title IX & Single-Sex Elementary & Secondary Classes & Extracurricular Activities (Dec. 1, 2014), ("Under Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes."); OCR, Questions & Answers on Title IX & Sexual Violence (Apr. 29, 2014) ("Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity."); Dep't of Educ., Dear Colleague Letter: Harassment & Bullying, Oct. 26, 2010, at 8, ("Title IX . . . protect[s] all students, including . . . transgender . . . students, from sex discrimination"). None of these guidance documents were withdrawn by DOE's 2017 Dear Colleague Letter.

[7] Defendants devote two pages of their argument briefing to snippets of floor speeches that generally discuss future rulemaking by Department of Education.  To the extent they proffer this as legislative history worthy of swaying this Court's analysis, as the Seventh Circuit pointed out in *Hively*, "[l]egislative history, however, is notoriously malleable." 853 F.3d at 343.

beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions

of our laws rather than the principal concerns of our legislators by which we are governed." 523

U.S. at 79.  Here, too, the legislators who passed Title IX wrote a broad statute that protects all

"person[s]" from discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Indeed, this Court

has repeatedly instructed courts to construe Title IX broadly to encompass "a wide range of

intentional unequal treatment." *Jackson*, 544 U.S. at 175.  Sex-based discrimination that harms

transgender individuals is a "reasonably comparable evil" that falls squarely within the statute's

plain text. *Oncale*, 523 U.S. at 79.  For example, Title IX protects students from sexual

harassment even though, when Congress enacted the statute, "the concept of 'sexual harassment'

as gender discrimination had not been recognized or considered by the courts." *Davis v, Monroe*

*County Bd. of Ed*, 526 U.S. 629, 664 (1999) (Kennedy, J., dissenting). "If Congress has made a

choice of language which fairly brings a given situation within a statute, it is unimportant that the

particular application may not have been contemplated by the legislators." *Barr v. United States*,

324 U.S. 83, 90 (1945).

Defendants also argue that sex discrimination against transgender people is implicitly

excluded from Title IX because in 2014, Congress included "gender identity" in the Violence

Against Women Act, a completely unrelated statute.[8]  *See* ECF 36-1 at 17.  However, "[w]hen a

later statute is offered as an expression of how the Congress interpreted a statute passed by

another Congress a half century before, such interpretation has very little, if any, significance."

---

[8] Defendants also place great weight on inclusion of the term "gender identity" in Maryland *state* non-discrimination law.  The 2014 legislative history of a state law has absolutely no relevance to Congressional intent in enacting Title IX in 1972. *Cf. Bilski*, 561 U.S. at 645 (2010) (internal quotation marks and ellipses omitted) ("When a later statute is offered as an expression of how the Congress interpreted a statute passed by another Congress a half century before, such interpretation has very little, if any, significance.").

*Bilski v. Kappos*, 561 U.S. 593, 645 (2010) (internal quotation marks and ellipses omitted).

Indeed courts have rejected similar claims of congressional inaction as a bar to include transgender people from discrimination based on sex, both in the context of Title IX and Title VII. *See, e.g., Highland*, 208 F.Supp. 3d at 865, n.5 ("Nor is the Court persuaded by Highland's attempts to glean the meaning of sex from Congress's inaction, specifically its failure to amend Title VII or Title IX to insert the phrase "gender identity" in contrast with its decision to add this phrase to the Violence Against Women Act.").

Nor should the defendants' attempts to discern legislative intent by failed attempts in Congress over forty years later carry any weight. *See id.* (ECF 36-1 at *17). This "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth*, 40 LLC, 562 U.S. 223, 242 (2011). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others.*" Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001); *see also Hively*, 853 F.3d at 343 (rejecting similar argument and detailing variety of reasons why amendments to legislation may be rejected). .

### ii.      *The Regulation does not Authorize Discrimination Against Transgender Students.*

The statutory text of Title IX does not contain any express exception allowing schools to provide such facilities on a gender-segregated basis, but the Regulation has long provided that a school may provide "separate toilet, locker room, and shower facilities on the basis of sex," so long as "such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R.§ 106.33.  The Regulation does not state how a school is to apply it in the case of a transgender student, and courts across the country have held that transgender students are entitled to such facilities.  In *G.G.* the Fourth Circuit concluded that the Regulation was "susceptible to more than one plausible reading" with respect to "how a

school should determine whether a transgender individual is a male or female for the purpose of access to sex segregated restrooms." *G.G.*, 822 F.3d at 720. The Court concluded that the Department's January 7, 2015 opinion letter resolved that ambiguity in a reasonable manner and was entitled to deference under *Auer*. *Id.* A few weeks before the Supreme Court was scheduled to hold oral argument in *G.G.*, DOE issued The 2017 Dear Colleague Letter withdrawing the January 7, 2015 opinion letter.  The letter contrasts the *G.G.* decision deferring to the Department's guidance with a district court's refusal to defer to that guidance in *Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016). In light of the conflicting rulings, the letter states that the Department intends "to further and more completely consider the legal issues involved." Dear Colleague Ltr. at 2.12.  Although DOE has abstained from providing any interpretation of 34 C.F.R. § 106.33, it has not withdrawn its other guidance documents stating that transgender students are protected under Title IX and must generally be treated in a manner consistent with their gender identity.[9]  Now that the January 7, 2015 opinion letter has been withdrawn, the Regulation should be interpreted de novo and without deference.[10]

---

[9] *See* footnote 6, *supra.*

[10] According to news reports, the Secretary of the Department of Education initially refused to withdraw the January 7, 2015 letter "because of the potential harm that rescinding the protections could cause transgender students." Jeremy M. Peters, et al., Trump Rescinds Rules on Bathrooms for Transgender Students, N.Y. Times (Feb. 22, 2017), https://goo.gl/k9Zwq0. The Attorney General, however, wanted to rescind the documents out of concern that the Department's interpretation would be upheld as reasonable by the Supreme Court. *Id.* Ultimately, the Attorney General appealed to the President who told the Secretary that she should either rescind the guidance documents or resign. *Id.*  Thus, even if DOE ultimately issues new guidance, the Court will have to interpret the regulation without deference because agencies do not receive *Auer* deference when they flip-flop from one position to another. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012). Additionally, the circumstances surrounding the Department's withdrawal of the previous guidance give "reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Id.* (internal quotation marks omitted); *see also Evancho*, 2017 WL 770619 at *20.

Properly construed within the context of the overall statutory scheme, the Regulation does not authorize schools to discriminate against boys and girls who are transgender by excluding them from the restrooms and locker rooms that other boys and girls use. *Cf. United States v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004) ("When a regulation implements a statute, the regulation must be construed in light of the statute" it implements). The only way to provide sex-separated restrooms and locker rooms in a manner consistent with the underlying statute is to allow boys and girls who are transgender to use those same facilities that other boys and girls use. The main provision of the statutory text, 20 U.S.C. § 1681(a), broadly prohibits all discrimination. Section 1681(a) then contains a series of subsections enumerating narrow contexts in which that prohibition on discrimination "shall not apply." Restrooms and locker rooms are not enumerated in any of those exceptions.  And, unlike those statutory exceptions, the Regulation does not state that the statute's ban on sex-based discrimination "shall not apply" to restrooms and locker rooms. Indeed, the agency would lack authority to create such an exemption because a regulation cannot authorize what the statute it implements prohibits. *See Time Warner Entm't Co. v. Everest Midwest Licensee*, LLC, 381 F.3d 1039, 1050 (10th Cir. 2004) ("[A] regulation must be interpreted in such a way as to not conflict with the objective of its organic statute.")

When read in light of its place within the overall statutory scheme, the Regulation permits differential treatment on the basis of sex, but only so long as the differential treatment does not subject anyone to unequal discrimination in violation of the statute. As the Fourth Circuit noted in *G.G*, "the plain meaning of the regulatory language is" that "the mere act of providing separate restroom facilities for males and females does not violate Title IX." 822 F.3d at 720.  The regulation is thus based on the premise that providing separate restrooms and locker

17

rooms for boys and girls reflects a social practice that does not disadvantage or stigmatize any student. *Cf. Virginia*, 518 U.S. 515, 533 (1996) [hereinafter "*VMI*"] ("Physical differences between men and women" may not be used "for denigration of the members of either sex or for artificial constraints on an individual's opportunity."). That premise is reinforced by the Regulation's caveat that when schools establish sex-separated restrooms and locker rooms, they must provide access to "comparable" restrooms for all students. 34 C.F.R. § 106.33

Nor would, as the defendants suggest, reasonably reading the regulations in the context of the statutory scheme result "in a construction that would absurdly mean that Title IX no longer protects men or women from discrimination on the basis of biological sex." ECF 36-1 at * 8. Rather the regulation simply authorizes schools to provide separate restrooms for boys and girls—not to discriminate against a subset of students on the basis of sex by excluding them from the same restrooms other boys and girls use.

Moreover, as discussed *supra*, at page 12, allowing boys and girls who are transgender to use the same restrooms as other boys and girls is entirely consistent with the ordinary definition of "sex," both at the time the Regulation was enacted and today.  But even if sex were defined solely based on physiology or anatomy, that still would not mean that transgender students should be assigned to restrooms or locker rooms based on the sex designated for them at birth. Many transgender individuals, including M, have physiological and anatomical characteristics typically associated with their identity, not the sex identified for them at birth. *See* Wylie C. Hembree, et al., Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline, 94(9) J. Clinical Endocrinology & Metabolism 3132-54 (Sept. 2009) ("Endocrine Society Guidelines"), https://goo.gl/lOroQj.

18

The reality is that—even without genital surgery—the bodies of many transgender boys (including M) look very different from the bodies of girls, and the bodies of many transgender girls look very different from the bodies of boys. *See id.* Additionally, as pointed out *supra*, at page 13, the Fourth Circuit has articulated the practical roadblocks to solely defining sex from one's anatomy. In any event, the "dispositive realit[y]" is that M is recognized by his family, his medical providers, his classmates, and the world at large as a boy. Allowing him to use the same restrooms and locker rooms as other boys is the only way to provide access to sex-separated restrooms and locker rooms without discrimination. It is, therefore, the only way to do so that is consistent with the underlying requirements of Title IX.

Finally, although M has alleged that, unlike any other student in his School, he is required to use inferiorly equipped changing rooms in lieu of the locker rooms that other boys enjoy, the defendants somehow read the complaint as acknowledging that M has not been subject to "harassment, ridicule, or an otherwise hostile environment." They would instead have this Court view their separate but unequal treatment of M as the mere administrative choice to designate locker room access based on "birth sex." (ECF 36-1 at * 11, n.13.) Judges Floyd and Davis recently explained in concurrence that segregating transgender people from "public spaces" is no mere administrative decision:

> G.G.'s case is about much more than bathrooms. It's about a boy asking his school to treat him just like any other boy. **It's about protecting the rights of transgender people in public spaces and not forcing them to exist on the margins.** . . . **G.G.'s plight has shown us the inequities that arise when the government organizes society by outdated constructs like biological sex and gender.**

*G.G. v. Gloucester Cnty Sch. Bd.*, 853 F.3d 729, 730 (4th Cir. 2017) (Davis, J. and Floyd, J. Concurring); *see also Brown v. Bd. of Educ.,* 347 U.S. 483, 494 (1954) (recognizing that racial

segregation of students "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

These harms have been recognized before. Women entering previously all-male work environments "often discover[ed] that the facilities for women [were] inadequate, distant, or missing altogether." *DeClue v. Cent. Ill. Light Co.*, 223 F.3d 434, 437 (7th Cir. 2000) (Rovner, J., dissenting). This disparity could "affect their ability to do their jobs in concrete and material ways," even if it sometimes struck men as "of secondary, if not trivial, importance." *Id. Cf.* Justice Sandra Day O'Connor, "'Out Of Order' At The Court: O'Connor On Being The First Female Justice." NPR (March 5, 2013), https://goo.gl/4llXNV ("In the early days of when I got to the court, there wasn't a restroom I could use that was anywhere near the courtroom."). At school, at work, or in society at large, limiting a person's access to common facilities like restrooms or locker rooms impedes their ability to participate as a full and equal member of the community. *G.G.*, 853 F.3d at 729 (Davis, J., and Floyd, J. concurring). Here, as elsewhere, "discriminatory treatment exerts a pervasive influence on the entire educational process." *Norwood v. Harrison*, 413 U.S. 455, 469 (1973). Therefore, for all these reasons, this Court should deny defendants' motion to dismiss his claims under Title IX.

**B.     M has Sufficiently Plead Facts to Allege that the Defendants are Discriminating Against Him in Violation of Federal and Maryland Equal Protection Constitutional Guarantees.**

By barring M from the boys' locker room and denying him access to the boys' bathroom for over a year, defendants have repeatedly and intentionally signaled M for discriminatory treatment because of his sex (including his gender identity and gender nonconformity) and his

20

transgender status.[11]  Whether defendants' treatment of M is viewed as based on M's gender, on

transgender status, or both, it is subject to heightened scrutiny under Maryland and federal equal

protection guarantees.  Regardless of the level of scrutiny applied, however, defendants have no

legitimate justification for their conduct, much less a persuasive one.  Their motion to dismiss

the state and federal equal protection claims (Counts II and III of the Complaint) should be

denied.

**1.        Discrimination Against Transgender People is Cognizable Sex Discrimination
           Under State and Federal Equal Protection Provisions.**

Since the Supreme Court established that sex stereotyping is a form of sex discrimination

in *Price Waterhouse*, courts have repeatedly recognized that transgender people, like everyone

else, are protected against discrimination that is based on the perception they do not conform to

such stereotypes.  *Glenn v. Brumby,* 663 F.3d 1312 (11th Cir 2011) ("heightened scrutiny

required" under equal protection for discrimination against transgender employee); *Smith v. City

of Salem,* 378 F.3d 566 (6th Cir. 2004) (equal protection applied to transgender employee);

*Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1191 (N.D. Cal. 2015) ("the Court concludes that

discrimination based on transgender status independently qualifies as a suspect classification

under the Equal Protection Clause because transgender persons meet the indicia of a "suspect" or

---

[11] Although M is the only student in the School who has been barred from the restrooms and continues to be denied access to the locker rooms that correspond to his gender identity, defendants claim that he "has not alleged [they] have treated him any differently than any other similarly situated students" because M is permitted to use restrooms and locker rooms based upon his the sex he was assigned at birth, or the unisex restrooms.  (ECF 36-1 at * 20.)  In rejecting a similar argument in *Evancho v. Pine-Richland School District*, the Court concluded: "Plaintiffs are being distinguished by governmental action from those whose gender identities are congruent with their assigned sex. The Plaintiffs are the only students who are not allowed to use the common restrooms consistent with their gender identities." 2017 WL 770619 at * 11 (concluding defendants' conduct constituted discrimination triggering equal protection).

"quasi-suspect classification" identified by the Supreme Court"); *cf. Finkle v. Howard County,*

12 F .Supp. 3d 780 (D. Md. 2014) (holding under *Price Waterhouse* and its progeny, including

*Glenn* and *Smith,* that transgender plaintiff asserted cognizable sex discrimination claim under

Title VII.)

In *Evancho*, the District Court for the Western District of Pennsylvania aptly explained

why differential treatment of transgender students like M is a sex-based classification warranting

heightened scrutiny:

> Moreover, as to these Plaintiffs, **gender identity is entirely akin to "sex" as that term has been customarily used in the Equal Protection analysis. It is deeply ingrained and inherent in their very beings**. **Like "sex," as to these Plaintiffs, gender identity is neither transitory nor temporary.** Further, what buttresses that conclusion is the fact that the school community as a whole treats these Plaintiffs in all other regards consistently with their stated gender identities, along with the reality that these Plaintiffs live all facets of their lives in a fashion consistent with their stated and experienced gender identities.

2017 WL 770619 at *13 (emphasis added).

Moreover, although this Court can simply apply the heightened scrutiny that is warranted

for any sex-based classification, it may also do so because transgender people are a quasi-suspect

class.  To determine whether a new classification requires heightened scrutiny, the Supreme

Court considers whether the class has: (1) historically been "subject to discrimination," (2) "has

a defining characteristic that frequently bears no relation to ability to perform or contribute to

society," (3) "exhibits obvious, immutable, or distinguishing characteristics that define them as a

discrete group" and  (4) is a minority or politically powerless *Highland*, 208 F.Supp.3d at 874

(internal quotations and citations omitted).

While the Fourth Circuit has not reached this question, it has certainly recognized

transgender people as "a vulnerable group that has traditionally been *unrecognized,*

22

*unrepresented, and unprotected*." *G.G. v. Gloucester Cnty Sch. Bd.*, 853 F.3d at 730 (emphasis added).  Moreover, several federal courts have recently recognized that discrimination against transgender people fits these prerequisites for heightened scrutiny. *See, e.g., Evancho,* 2017 WL 770619 at * 13-14; *Highland*, 208 F.Supp.3d at 874; *Adkins v. City of New York*, 143 F. Supp. 3d 134, 138-40 (S.D.N.Y. 2015).

Notably, the defendants do not address any of these cases. Instead, relying on a cobbling together of two outlier cases, *Etsitty v. Utah Transit Administration*, 502 F.3d 1215 (10th Cir. 2007) and *Johnson v. University of Pittsburgh*, 97 F. Supp. 3d 657 (W.D. Pa. 2015), as well as a series of older, unreported cases with pro se plaintiffs, defendants attempt to convince this court that rational basis is the proper standard here.  As an initial matter, the unreported cases carry little precedential or persuasive weight—especially, where as here, there is no in-depth analysis or any attempt to address the substantial precedent to the contrary, contained therein. *See Kvaerner ASA v. Bank of Tokyo-Mitsubishi, Ltd., N.Y. Branch,* 210 F.3d 262, 267 n.5 (4th Cir. 2000) (noting unreported cases have "no precedental value").

*Etsitty* and *Johnston* do not provide any firmer footing for the defendants' position.  These decisions were largely premised on an outdated meaning of sex discrimination "only that it is "unlawful to discriminate against women because they are women and men because they are men." 502 F.3d at 1222, 1227.  As explained in Part A, *supra*, incorporated by reference herein, that interpretation of sex is untenable and incorrect.  Indeed, two of the cases relied upon by these courts have been expressly overruled.[12] And at least one court has noted that *Johnston* "has little

---

[12] *Ulane v. E. Airlines, Inc.,* 742 F.2d 1081, 1084 (7th Cir.1984*)* was overruled by *Hively v. Ivy Tech Cmty. College of Ind*.,  853 F.3d 339 (7th Cir. 2017). *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 662–63 (9th Cir.1977) was recognized as overruled by *Price Waterhouse by Schwenk v. Hartford*, 204 F.3d 1187, 1201-03 (9th Cir. 2000).

persuasive value" because of its reliance on outdated case law. *Highland*, 208 F.Supp.3d at 875; *see also Evancho.* 2017 WL 770619 at * 13, n.33 (disagreeing with *Johnston*).

As noted above, in the past years transgender people have been found repeatedly to be exactly the type of "unrecognized, unrepresented, and unprotected," *G.G. v. Gloucester Cnty Sch. Bd.*, 853 F.3d at 730, group likely to be subject to discrimination and in need of the Fourteenth Amendment. While it is literally true that the Fourth Circuit and the U.S. Supreme Court have not yet adopted this position, they certainly have not foreclosed it. Indeed, given the breadth of precedent recognizing the rights of transgender people, it is likely they will follow suit. Defendants[13] certainly make no serious attempt to argue the merits of their position that the discriminatory conduct at issue should receive only rational basis review.

**2.        Discriminating Against Transgender Students to Address the Hypothetical Privacy Concerns of Other Students is not Substantially Related to an Important Government Interest.**

---

[13] Defendants erroneously assert that M has sought money damages from the defendants for Count II of the Complaint, his federal Equal Protection Section 1983 claim. *Compare* Complaint at Request for Relief ¶ C *with* ECF 36-1 at 19, n.19 (no money damages asserted for Count II). They thus claim that defendant, Board of Education of Talbot County ("Board") is not a person under *Will v. Michigan Department of State Police* because "it is a State agency, rather than a county or municipal agency, and is thus entitled to Eleventh Amendment immunity." (ECF 36-1 at * 18.) However, *Will*'s person requirement does not apply to claims of injunctive relief. As the Supreme Court has explained, "State officers in their official capacities, like States themselves, are not amenable to suit *for damages* under § 1983." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997) (noting in Section 1983 suit against state official for money damages Eleventh Amendment not relevant because state official not person under Section 1983 for money damages relief.)    Defendants also claim that M's claims for injunctive relief against the Board is barred under *Pennhurst v. Halderman*, 465 U.S. 89 (1984). However, to the extent this is relevant in a claim for injunctive relief, defendants' Eleventh Amendment immunity has been waived for claims of up to $400,000. *See* Md. Stat. Ann. Cts & Jud. ¶5-518; *see also Lee-Thomas v. Prince George's County Public Schools,* 666 F.3d 244, 254 (4th Cir. 2012). *Pennhurst's* Eleventh Amendment concerns, (which itself only involved a claim for damages) only apply "in the absence of [a state's] consent." 465 U.S. at 100-01.  As the state has consented to suit, there is no Eleventh Amendment issue here under *Pennhurst*.

24

As a sex-based classification, the defendants' ban on M's use of the boys' locker rooms is subject to intermediate scrutiny. "Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *VMI*, 518 U.S. at 531.[14] To satisfy this "demanding" standard, defendants bear the burden to "show at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 524 (internal quotation marks omitted). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* at 533.

Defendants' justification for their disparate treatment of M's rests on the "privacy rights of all students at the school," or their "sexual privacy," which they couch as a "constitutional right," the roots of which, they do not bother to define. (ECF 36-1 at *21-2, 26.)  Citing to a series of cases involving compulsory strip searches and involuntary videotaping, they also note that the students "whose ages typically run from 11 years old in sixth grade to 18 years old in the twelfth grade, are arguably at the peak of discomfort and vulnerability with regard to the physical, emotional, and psychological aspects of human sexuality." (ECF 36-1 at * 23.)

As an initial matter, defendants have offered no factual basis for their privacy claims, and nor could they. Defendants' theory of "sexual privacy" is just that—a legal theory put forth in response to one student's request to be treated as any other student. (Compl. ¶ 43.)  Accordingly,

---

[14] Citing to dicta from *VMI* concerning the adequacy of VMI's remedy and to the case *of Nguyen v. INS*, 533 U.S. 53 (2001), defendants state that the Supreme Court has linked physiology to privacy and "has distinguished between the sexes on the basis of physiology."  (ECF 36-1 at *25.)  However, "[p]hysical differences between men and women" may not be used "for denigration of the members of either sex *or for artificial constraints on an individual's opportunity*." *VMI,* 518 U.S. at 533.  And as discussed fully herein, defendants' speculations of "sexual privacy" is a non-starter.

it is not entitled to any deference.[15] *VMI*, 528 U.S. at 518.

Additionally, Defendants cannot merely use the word "privacy" and then automatically invoke the protections of the Constitution. *See, e.g., Moran v. Beyer*, 734 F.2d 1245, 1246 (7th Cir. 1984) (explaining that "not every choice made in the context of marriage implicates the privacy and family interests . . . that the decision itself accedes to the status of a fundamental right"); *Dronenburg v. Zech*, 741 F.2d 1388, 1397 (D.C. Cir. 1984) (explaining that lower courts should not expand privacy rights that have not been clearly recognized by the Supreme Court). Still further, constitutional privacy rights, whether based in the Fourth Amendment or the Fourteenth Amendment, "are different in public schools than elsewhere." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). "[I]t is well established that public school students enjoy a reduced expectation of privacy in comparison to the public at large." *Dominic J. v. Wyoming Valley W. High Sch.*, 362 F. Supp. 2d 560, 570 (M.D. Pa. 2005). Of particular relevance here, public school locker rooms in this country traditionally have been and remain "not notable for the privacy they afford." *Vernonia*, 515 U.S. at 657.

M's use of the boys' locker room will not present the specter of "constitutional abuses" of students being forced to disrobe while being viewed against their will  by a person with different anatomy, *G.G.*, 822 F.3d at 723 n.10 (majority op.).  The School's boys' locker room is equipped with "stalls that are partitioned, or are capable of being partitioned, such that any student who wishes to disrobe in greater privacy from other students could do so. In addition, the toilet facilities within the boys' locker room are partitioned into private stalls that each have a stall door." (Compl ¶ 48.)  Moreover, as defendants admit, the unisex changing rooms that they

---

[15] Indeed, although defendants repeatedly claim that they grant access to sex segregated facilities by the sex assigned at birth, they offer no standardized criteria for how exactly the determine what "sex assigned at birth" is.

require M to use are open to any student in the school should they choose a greater degree of privacy. (ECF 36-1 at * 20.)

None of M's fellow students has expressed any objection to his use of the boys' restrooms or locker rooms; to the contrary, they have supported and congratulated him in obtaining access to the boys' restrooms in the wake of *G.G. See* Compl. ¶ 49.  Moreover, even if some students do not wish to change clothes in the locker room in close proximity to M, the extent to which they have to be so, or for it to be possible for M inadvertently to observe them, is entirely within their control. They can avail themselves of the privacy features of the locker room or, at worst, they may use the single-occupancy restrooms if they prefer.  As Judge Davis observed in *G.G.*: "For other students, using the single- stall restrooms carries no stigma whatsoever, whereas for G.G., using those same restrooms is tantamount to humiliation and a continuing mark of difference among his fellow students."  *G.G.*, 822 F.3d at 729 (Davis, J., concurring); *Cf. Cruzan v. Special Sch. Dist. No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (employee who did not want to use same restroom as a transgender employee was free to use unisex restroom instead); *Lusardi*, 2015 WL 1607756, at *9 ("Some co-workers may be confused or uncertain about what it means to be transgender, and/or embarrassed or even afraid to share a restroom with a transgender co-worker. But supervisory or co-worker confusion or anxiety cannot justify discriminatory terms and conditions of employment.").

This case is thus a far cry from the cases involving surreptitious video surveillance or strip searches in a police or correctional context, cited by the defendants and *G.G.* dissent, and this case does not present those concerns anymore than *G.G.* did.  As the *G.G.* majority observed, the amorphous possibility of  "'sexual responses prompted by students' exposure to the private body parts of students of the  other biological sex,' 822 F.3d at 723 n.11 (quoting dissent), is not

a cognizable danger sufficient to bar M from accessing the locker room.

None of defendants' authority could be reasonably construed as a basis for "sexual privacy," here.  Rather, what the defendants really assert is an alleged right to change in a locker room from which transgender male students are excluded.  But, "[n]o case recognizes a right to privacy that insulates a person from coming into contact with someone who is different than they are, or who they fear will act in a way that causes them to be embarrassed or uncomfortable, when there are alternative means for both individuals to protect themselves from such contact, embarrassment, or discomfort."  *Students v. United States Department of Education*, slip op., No. 16-cv-4945 2016 WL 6134121 (N.D. Ill. Oct. 18, 2016).[16]   As the Northern District for Illinois explained in holding that "high school students do not have a fundamental constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs[:]"

> **Contemporary notions of liberty and justice are inconsistent with the existence of the right to privacy asserted by Plaintiffs and properly framed by this Court.** A transgender boy or girl, man or woman, does not live his or her life in conformance with his or her sex assigned at birth.
>
> Further, people who interact with [transgender students] largely treat them consistent with their gender identity. In fact, many people who interact with [them] on a daily basis may have no idea, and may not care, what sex they were assigned at birth.

*Id.* at * 25, 27 (noting that transgender people enjoyed full integration to facilities in line with their gender identity in the military, college sports, and federal agencies).

---

[16] Though *Students v. United States Department of Education* is a slip opinion, its discussion of the issues therein are "so squarely on point as to be incapable of escaping notice." *Stainaker v. Gen. Motors Corp.*, 972 F. Supp. 335, 337 (D. Md. 1996).

Still further, defendants' speculations about inevitable exposure to nudity in locker rooms do not reflect the actual experiences of students in many school districts. *See* Brief of Amicus Curiae of School Administrators, *Gloucester Sch. Bd. v. G.G.*, 2017 WL 930055 (U.S.) at *13-14 (U.S., 2017) [hereinafter Administrator Amicus]; *Students*, 2016 WL 6134121, at *28 (transgender students and non-transgender students used same locker rooms without ever seeing "intimate part[s]" of one another's bodies). Schools across the country already include transgender students in locker rooms while accommodating the privacy of all students in a non-stigmatizing manner with privacy curtains and private changing areas. *See Students*, 2016 WL 6134121, at *29 (privacy accommodations prevented any risk of "involuntary exposure of a student's body to or by a transgender person assigned a different sex at birth"). Transgender students have their own sense of modesty and often go to great lengths to prevent exposure of any anatomical differences between themselves and other students. *See* Administrator Amicus, 2017 WL 930055 at *13-14. Experience has shown that there are many ways to address privacy concerns in an even-handed manner without segregating transgender students from their peers.

Moreover, as demonstrated *supra,* at pages 26-27, while treating M in accordance with his male sex would not harm any other students' alleged privacy interests, failing to do so has serious negative consequences for M's privacy. Compelling him to use the girls' locker rooms or the unisex bathrooms will necessarily raise scrutiny and questions from other students about why he is the only boy to do so. Each of those actions potentially "outs" M as transgender to students and teachers who do not otherwise know or need to know. (Compl. ¶ 41.)

The Supreme Court has long recognized that the federal constitutional right to privacy protects an individual's right to control the release of information of a highly personal nature. *See Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). This right to informational privacy restricts a

29

government agency's ability to disclose information about an individual's sexual orientation or gender identity. *See, e.g.*, *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) ("It is difficult to imagine a more private matter than one's sexuality and a less likely probability that the government would have a legitimate interest in disclosure of sexual identity.").

Because transgender people face such high rates of discrimination, harassment, and violence, courts have been particularly conscious of the danger of revealing a person's transgender status to others without the person's explicit and voluntary consent.  For example, the Second Circuit held that the nonconsensual disclosure to others of a prisoner's transgender status violated the prisoner's constitutional right to privacy, noting the widespread "hostility and intolerance" transgender people face, as well as the "excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, [which] is really beyond debate." *Powell v. Schriver,* 175 F.3d 107, 111 (2d Cir. 1999). Another federal court recently considered a state policy that prevented many transgender people from changing the gender marker on their driver's licenses, and thereby "outed" transgender people to others who could conclude that the person was transgender because their "lived sex" was inconsistent with the gender marker on the ID. *Love v. Johnson*, 146 F. Supp. 3d 848, 854 (E.D. Mich. 2015). The court recognized the fact that transgender people face widespread discrimination and violence, and held that "the Policy creates a very real threat to Plaintiffs' personal security and bodily integrity" and thereby implicated "their fundamental right of privacy." *Id.* at 856 (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1060 (6th Cir. 1998)).[17]

---

[17] Indeed, courts have recognized in other contexts that students have the right to share or withhold information about their sexual orientation or gender identity, and it is against the law for school officials to disclose, or compel students to disclose, that information. Even when a student appears to be open about his or her sexual orientation or gender identity at school, it remains the student's right to limit the extent to which the information is further shared. *C.N. v. Wolf*, 410 F. Supp. 2d 894, 903 (C.D. Cal. 2005) ("[T]he fact that an event is not wholly private

30

For all these reasons, defendants' justification cannot survive heightened scrutiny. There is no constitutional right to "sexual privacy," and any limited right to bodily privacy is not implicated here. As discussed *supra*, not only do the locker rooms already have privacy features, but the defendants have other non-discriminatory options for protecting the privacy of all students equally without excluding or endangering transgender students. Thus, even if this court were to recognize defendants' alleged privacy interest as an "exceedingly persuasive justification," (which it is not) the "discriminatory means employed" here are not "substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 524.

**3.     Even if the Court Applied Rational Basis Review, the Defendants' Actions Would not Survive Scrutiny.**

Even under the most deferential standard of review, defendants must show that its actions "bear[] a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). That test is not "toothless." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). The Supreme Court has made clear that review must be meaningful when the policy at issue targets a vulnerable group. *See Romer*, 517 U.S. at 634-35 (invalidating law that burdened the "politically unpopular group" of lesbian, gay, and bisexual people); *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause."); *Kelo v. City of New London*, 545 U.S. 469, 490-91 (2005) (Kennedy, J., concurring) (distinguishing between the rational basis test applied to "economic regulation" as opposed to classifications discriminating against a particular group of people).

---

does not mean that an individual has no interest in limiting disclosure or dissemination of information.").

Here, defendants' intentional policy of singling out transgender students for differential treatment serves no purpose other than to cater to imagined fears that other students or community members might be uncomfortable sharing spaces with transgender students or otherwise treating transgender students respectfully in accordance with their gender identities. Accommodating other people's potential discomfort with an unpopular group is not a legitimate basis for discriminatory treatment. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (intention to exclude a "politically unpopular group" from receiving benefits "cannot constitute a legitimate governmental interest"); *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 448 (1985) ("mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable . . . are not permissible bases" for differential treatment of a vulnerable group). Those who harbor irrational fears or discriminatory biases do not get a "heckler's veto" over others' exercise of their basic civil rights. *Cf. Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (rejecting a discrimination claim by an employee who did not want to use the same restroom as a transgender employee, noting that she was free to use unisex restroom instead); *G.G.,* 822 F.3d at 723 n.11. Instead of being tailored to address privacy interests related to nudity, the defendants rest on generalized fears and discomfort that are not a legitimate basis for imposing unequal or stigmatizing treatment under any standard of scrutiny. *See Evancho*, 2017 WL 770619, at \*16 n.42; *Highland*, 208 F. Supp. 3d at 877. For all these reasons this Court should deny defendants' motion to dismiss Counts II and III of the Complaint.

C.     **M has Sufficiently Plead Facts to Allege that Defendants have Violated his Rights Under Maryland's Equal Rights Amendment.**

Article 46 of the Maryland Declaration of Rights ("Maryland's ERA") provides, that "[e]quality of rights under the law shall not be abridged or denied because of sex." Defendants do not dispute that Maryland's ERA extends to "classifications based on gender[.]" (ECF 36-1 at

32

* 28.) And although they devoted a substantial portion of their argument laboring to establish that discrimination based on "gender" or "gender identity" is not the same as sex-based discrimination, they now assert that M's claims do not fall within Article 46 because the Court of Appeals, in *Conaway v. Deane*, 401 Md. 291 (2007), *abrogated by Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015), did not apply the ERA to sexual orientation (a concept distinct from gender or gender identity).

As an initial matter, defendants incorrectly conflate the concepts of sexual orientation and gender identity. However, transgender "is different than sexual orientation." *Lewis v. High Point Reg. Health Sys.*, 79 F. Supp. 3d. 588, 589 (E.D.N.C. 2015) (noting same and rejecting the defendant's argument that Title VII claim of transgender employee should be dismissed because "neither the Supreme Court nor [the] Fourth Circuit has recognized Title VII as protecting individuals because of their sexual orientation" as that was a "different concept[]"). Thus, as discussed more fully below, *Conaway* has no application here.

Still further, *Conaway* is no longer good law. There, the majority opinion went to great lengths to protect the right of the legislature to prevent same-sex couples from exercising their fundamental right to marry—a view soundly rejected by the Supreme Court in *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015) in upholding the "fundamental right" of same-sex couples to marry. Its use to this Court is thus limited. *Cf. Hively*, 853 F.3d at 351 (noting *inter alia,* that in light of wave of Supreme Court decisions recognizing fundamental rights of gay and lesbian Americans, prior precedent reading "sexual orientation" out of sex-based discrimination was no longer of value).

To the extent *Conaway* is relevant it stands for nothing more than the unremarkable proposition that the ERA "differentiate[s] between men and women as classes on the basis of

33

some misconception regarding gender roles in our society" in other words, that it "prohibits discrimination based on pre-conceived notions, based solely on [one's] sex[.]" *Conaway*, 401 Md. at 270, 258.[18]  For the reasons stated in Parts IIIA(1) and IIIB(1) of this memorandum incorporated by reference herein, M has alleged more than sufficient facts to demonstrate that the defendants treat him differently from other boys on the basis of sex, including his gender identity, nonconformity to male stereotypes (*i.e.*, that he was not assigned male at birth and may have certain physical features different from other boys), and transgender status.  For the reasons detailed in those sections, M has more than sufficiently alleged the defendants' actions constitute an improper classification based on gender in violation of the ERA.  Therefore, the Court should deny defendants' motion to dismiss Count IV of the complaint.

## IV.    CONCLUSION

**WHEREFORE** for all the reasons stated therein, plaintiff respectfully requests that this Court deny the defendants' motion to dismiss in its entirety.  A proposed order is attached for the Court's consideration.

---

[18] The majority in *Conaway* rejected this view based on an overly narrow view of gender roles as they pertain to sexual orientation. However, as the Seventh Circuit has recently recognized in *Hively*, discrimination based on sexual orientation reflects a failure to conform to gender norms. 853 F.3d at 346 (noting plaintiff "represents the ultimate case of failure to conform to the female stereotype (at least as understood in a place such as modern America, which views heterosexuality as the norm and other forms of sexuality as exceptional): she is not heterosexual.")

Date: May 22, 2017                                    Respectfully Submitted,


_____/s/_____

Jennifer Kent, Esq.
D. Md. Bar No. 28870
Laura M. DePalma
D. Md. Bar No. 19526
FreeState Justice, Inc.
231 E Baltimore Street, Suite 1100
Baltimore, Maryland 21202
t: (410) 625-5428
f: (410) 625-5428
e: jkent@freestate-justice.org
e: ldepalma@freestate-justice.org

35