IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| **M.A.B., a minor,** | \* | |
| by and through his parents and next friends, | | |
| L.B. and L.B., | \* | |
| | | |
| Plaintiff, | \* | |
| | | |
| **v.** | \* | **Civil Action No.: 16-02622-GLR** |
| | | |
| **BOARD OF EDUCATION OF** | \* | |
| **TALBOT COUNTY,** *et al.* | | |
| | \* | |
| Defendants. | | |
| | \* | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN REPLY TO OPPOSITION TO MOTION TO DISMISS

Defendants, the Board of Education of Talbot County ("the Board"), as well as Kelly L. Griffith and Tracy Elzey (the "Individual Defendants") (collectively, "Defendants"), by their undersigned counsel, file this Reply to Plaintiff's Opposition to the Defendants' Motion to Dismiss.  For the reasons set forth below, this Court should dismiss each Count set forth in Plaintiff's Complaint for failure to state a claim upon which relief may be granted.

**I.      ARGUMENT.**

**A.   Plaintiff Has Not Asserted a Cognizable Title IX Claim.**

Plaintiff's argument in his Opposition as it relates to his Title IX claim is based primarily on two theories:  (1) that Title IX should be broadly construed in light of courts' construction of other federal civil rights laws; and (2) more specifically, that Title IX should essentially be construed *in pari materia* with Title VII.  Unfortunately for Plaintiff, the Supreme Court and other courts—including those cited by Plaintiff in his Opposition—have rejected those theories.

Plaintiff begins his argument by asserting that "[t]he Supreme Court has 'consistently interpreted Title IX's private cause of action *broadly* to encompass diverse form of intentional discrimination.'" *See* ECF 40 at 8[1] (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) and citing *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520 (1982)) (emphasis added by Plaintiff). Neither *Jackson* nor *Bell*, however, involved the question of whether the phrase "sex" as it appears in Title IX includes "gender identity," and thus their application to the question at the center of the instant litigation is limited.

This is especially true given the fact that Title IX is Spending Clause legislation, *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998), and when Congress acts pursuant to its power under the Spending Clause, the legislation is "much in the nature of a *contract*: in return for federal funds, the [funding recipients] agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (emphasis in original). As such, "[j]ust as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress' power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* Plaintiff does not contend that the word "sex" as it appears in Title IX unambiguously includes "gender identity." Consequently, Plaintiff's contention that Title IX should be broadly construed in order to reach classifications not unambiguously expressed by Congress is without merit.[2]

---

[1] All references to page numbers within ECF 40 are to the court-stamped page numbers.

[2] The doctrine of constitutional avoidance also forecloses Plaintiff's argument that Title IX should be construed broadly. *See, e.g., Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (stating that "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court.").

Also without merit is Plaintiff's heavy reliance throughout his Opposition on Title VII case law.  Although it is true that courts routinely look to Title VII case law in evaluating Title IX claims, even the cases cited by Plaintiff acknowledge that there are significant limits that must be imposed given the very different natures of these two statutes.  *See, e.g., Whitaker v. Kenosha Unif. Sch. Dist.*, 2016 WL 5239829, at \*3 (E.D. Wisc. Sept. 22, 2016) (rejecting overreliance on Title VII case law as to the definition and scope of "sex" because Title VII is "a different statute with a different legislative history and purpose").  Indeed, unlike Title IX, which is Spending Clause legislation constrained by the contract-like principles referenced above, "Title VII was enacted pursuant to Congress' power under the Commerce Clause and § 5 of the Fourteenth Amendment," *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 367 (1978) (Brennan, J., concurring in part and dissenting in part),[3] with the intent to end employment discrimination, "wherever it was found."  *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005); *see also Gebser*, 524 U.S. at 286-87 (explaining that "[t]h[is] contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition. Title VII applies to all employers without regard to federal funding and aims broadly to eradicate discrimination throughout the economy"); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015) (justifying its liberal construction of Title VII on the reasoning that "[t]his holistic approach is also consistent with the broad remedial purpose of Title VII: to root out the "cancer of discrimination in the workplace") (internal brackets omitted). Thus, Plaintiff's sweeping argument that "[i]t is by now well-established that the phrase 'based

---

[3] More specifically, "[w]hen originally enacted, Title VII was explicitly bottomed upon the Commerce Clause and implicated only private conduct.  Congress referred specifically to section 5 of the Fourteenth Amendment, however, when it amended Title VII in 1972 so as to cover state and local employees." *Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 700 (1st Cir. 1983) (internal citations omitted).

on sex,' as articulated in the federal civil rights laws, prohibits a broad range of discriminatory practices based both on sex and gender," *see* ECF 40 at 9, is simply inapposite.

Nevertheless, the Defendants would be remiss if they did not specifically address the cases cited by Plaintiff, none of which compel the conclusion that Title IX prohibits distinctions made on gender identity. For example, Plaintiff argues that "'[b]ased on sex' does not, as older cases suggested, include only 'discrimination against women because they are women and against men because they are men.'" *Id.* (quoting *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984)). Plaintiff notes that *Ulane* was overruled by *Hively v. Ivy Tech Community College of Indiana*, 853 F.3d 339 (7th Cir. 2017), which, as Plaintiff correctly notes, held that the word "sex" included claims for sexual orientation. Setting aside the issue of whether *Hively* (a pure sexual orientation discrimination case) overruled *Ulane* (a case in which the Seventh Circuit held that "Title VII is not so expansive in scope as to prohibit discrimination against transsexuals"), Plaintiff's reliance on *Hively* is misplaced because the law of the Fourth Circuit is clear that Title VII does not prohibit discrimination on the basis of sexual orientation. *See Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 143 (4th Cir. 1996) (stating that "Title VII does not afford a cause of action for discrimination based upon sexual orientation"); *see also Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 814 (E.D. Va. 2016) ("It is explicitly the law of the Fourth Circuit that Title VII does not protect against discrimination based on sexual orientation.").[4]

---

[4] Of note, every other Circuit to have considered the issue has held that Title VII does not prohibit sexual orientation discrimination. See, *e.g., Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005); *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 290 (3d Cir. 2009); *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 143 (4th Cir. 1996); *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979); *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 471 (6th Cir. 2012); *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989); *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005); *Fredette v. BVP Mgmt. Assocs.*, 112 F.3d 1503, 1510 (11th Cir. 1997).

Plaintiff also relies heavily on *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), for the proposition that "a woman denied a promotion because her colleagues perceived her to be too masculine stated a claim under Title VII because that denial was based on gender stereotyping." *See* ECF 40 at 9.  *Hopkins* is inapposite for several reasons.  First, it is a Title VII case, and a broad construction of it does not carry over by analogy to a Spending Clause statute like Title IX. Second, the lead opinion in *Hopkins* was a four-Justice plurality, and the precise issue before the Court was the allocation of burdens of proof on the element of causation in a mixed-motive Title VII case, not the "sex stereotyping" or "gender stereotyping" issue for which *Hopkins* is most well-known.  Third, and perhaps most substantively, neither *Hopkins* nor any subsequent decision of the Supreme Court or Fourth Circuit created an independent cause of action for "gender stereotyping"; to the contrary, the Supreme Court stated that the presence of sex stereotyping by an employer "can certainly be *evidence*" of sex discrimination, but to prove her case, the plaintiff "must show that the employer actually relied on her gender in making its decision." *Hopkins*, 490 U.S. at 521 (emphasis in original).

Plaintiff's reliance upon *Oncale v. Sundowner Offshore Services, Inc.* 523 U.S. 75 (1998), is also misplaced.  Plaintiff notes that, in that case, "the Supreme Court held that male-on-male sexual harassment was a cognizable claim under Title VII, although it was certainly not 'the principal evil Congress was concerned with when it enacted Title VII.'"  *See* ECF 40 at 9 (quoting *Oncale*, 523 U.S. at 79); *see also* ECF 40 at 15-16 (quoting *Oncale* for the proposition that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed").  But *Oncale* held only that same-sex sexual harassment may support a claim under Title VII *provided* that it "meets the statutory requirements." *Oncale*,

523 U.S. at 79-80.[5]  Indeed, the Court reiterated that in all sex discrimination cases, "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Id.* at 80.  Thus *Oncale* does not lend any support to redefining the phrase "sex" in Title VII, and it certainly does not lend any such support with regard to Title IX.

The same problems befall Plaintiff's argument that, "[i]n line with these Supreme Court cases above [*i.e., Hopkins* and *Oncale*], 'the First, Sixth, Ninth, and Eleventh Circuits have all recognized that discrimination against a transgender individual based on that person's transgender status is discrimination because of sex under federal civil rights statutes and the Equal Protection Clause of the Constitution.'"  *See* ECF 40 at 10 (quoting *G.G. v. Gloucester County Sch. Bd.*, 654 Fed. Appx. 606, 607 (4th Cir. 2016) (Davis, J., concurring), which cites *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004), *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000), and *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000)).  Aside from the fact that the *G.G.* opinion cited by Plaintiff is from a concurring opinion of an Order denying a stay of an injunction which has since been vacated by the Supreme Court, none of the four decisions cited involve Title IX or other Spending Clause legislation, and none involve the unique public school context.  Rather,

---

[5] More specifically, Justice Scalia, writing for the majority, stated:

> We see no justification in the statutory language or our precedents for a categorical rule excluding same-sex harassment claims from the coverage of Title VII.  As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII.  But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits "discrimination . . . because of . . . sex" in the "terms" or "conditions" of employment.  Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements.

*Oncale*, 523 U.S. at 79–80 (ellipses in original).  Again, Justice Scalia wrote those words in the context of a Title VII case—a statute which Congress intended to be broadly construed to eradicate certain enumerated types of discrimination from the American workplace.  To extend the foregoing reasoning—written by one of the most famous strict constructionists in the Supreme Court's history—to Title IX would be indefensible.

they involve an Equal Protection Clause claim brought by an employee (*Glenn*), a Title VII claim brought by an employee (*Smith*), an Equal Credit Opportunity Act claim brought by a prospective borrower (*Rosa*), and claims under the Eight Amendment and Gender Motivated Violence Act by a prisoner (*Schwenk*).

Plaintiff next argues that "discrimination against transgender people is sex discrimination because it impermissibly rests on sex stereotypes and gender-based assumptions." *See* ECF 40 at 10.[6]  Whether that is true or not as a legal matter is beside the point.  Although the Supreme Court has recognized since *Hopkins* that gender stereotype discrimination may be evidence of sex discrimination, Plaintiff has not alleged that the Board has denied him access to locker rooms because of the way he dresses, talks, acts, or any other outward expression.  *Compare* ECF 1 *with Evans v. Georgia Reg'l Hosp.*, 850 F.3d 1248, 1254 (11th Cir. 2017) (affirming dismissal of gender non-conformity claim on the reasoning that, while "discrimination based on gender non-conformity is actionable, . . . [plaintiff] did not provide enough factual matter to plausibly suggest that her decision to present herself in a masculine manner led to the alleged adverse employment action"); *Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 661-63 (W.D. Tex. 2014) (explaining that, "[s]ince *Price Waterhouse,* courts have relied on the sex stereotyping doctrine in finding discrimination based on sex under Title VII," but "[i]n so finding, courts have generally required evidence of gendered statements or acts that target a plaintiff's conformance with traditional conceptions of masculinity or femininity," and holding that "[b]ecause [plaintiff] has failed to present evidence showing that the discrimination was motivated by her failure to act

---

[6] The cases Plaintiff cites to support this argument—*i.e., Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509 (D. Conn. 2016); *Schroer v. Billington*, 577 F. Supp. 2d 293 (D. D.C. 2008); and *Finkle v. Howard County*, 12 F. Supp. 3d 780 (D. Md. 2014)—are distinguishable because they involve failure-to-hire claims based on the employer's discomfort with the prospective employees' transitioning from one gender to the other and other related outward expressions of identity.  Here, there are no allegations that the Defendants have discriminated against Plaintiff because of such outward expressions.

as a stereotypical woman would, [plaintiff] has not presented a cognizable gender stereotyping claim and cannot succeed in showing that the discrimination or hostile work environment claim that she presents is 'because of sex,' as Title VII requires").  Indeed, the Board's standard rejects classifying students based on whether they meet stereotypical notions of maleness or femaleness; it does not allow "masculine" boys into the boys' locker room while allowing more "effeminate" boys into the girls' locker room.  Instead, its policy designates locker rooms based on biology alone, regardless of how students look, act, talk, or dress.  As such, the Board's policy is the *opposite* of the kind of sex stereotyping prohibited by *Hopkins*.[7]

Plaintiff next argues that "[t]he overwhelming majority of district courts to consider the question have found that transgender individuals are protected from discrimination 'on the basis of sex,'" citing as support *Evancho v. Pine-Richland School District*, ___ F. Supp. 3d ___, 2017 WL 770619 at * 19 (W.D. Pa. February 27, 2017), and the cases collected therein.  As an initial matter, the string cite of cases in *Evancho* are almost all Title VII cases of limited value for the reasons discussed above, and nowhere in *Evancho* did that court state that the "overwhelming majority" of courts have concluded that transgender individuals are protected from discrimination by Title VII merely because they are transgender.  Moreover, at least one court that has undertaken that analysis has come to the opposition conclusion.  *See Johnston v. Univ. of Pittsburg*, 97 F. Supp. 3d 657, 674 (W.D. Pa. 2016) (stating that "nearly every federal court that has considered the question [as to whether "transgender is . . . a protected characteristic under the

---

[7] On May 30, 2017, after Plaintiff filed his Opposition, the Seventh Circuit in *Whitaker v. Kenosha Unif. Sch. Dist.*, ___ F.3d ___, 2017 WL 2331751 (7th Cir. May 30, 2017), affirmed the grant of a preliminary injunction in favor of a transgender high school student seeking access to restrooms based upon his gender identity.  In ruling that the student had established a likelihood of success on his Title IX claim, the Court treated the student's claim as a "sex-discrimination claim[] based upon a theory of sex-stereotyping as articulated . . . by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)."  *See* 2017 WL 2331751, at *9.  The Seventh Circuit's holding is distinguishable because, as noted above, there is no allegation in the instant case that the Defendants have sex-stereotyped Plaintiff based upon his outward expression.

8

statute"] in the Title VII context has found that transgendered individuals are not a protected class under Title VII").

More importantly, the few Title IX cases the *Evancho* court cites as evidence of "broader readings of the term 'sex' . . . in the context of Title IX claims" are either distinguishable or no longer good law in light of the Supreme Court having vacated the Fourth Circuit's judgment in *G.G.*[8]   Indeed, the *Whitaker*, *Highland*, and *Carcano* courts based their decisions on granting *Auer* deference to the now-rescinded guidance issued by the United States Department Education's Office of Civil Rights ("OCR"), and *Corral* (retaliation claim brought by an employee for having reported same-sex student harassment) and the *K.S.* (student-on-student harassment claim) contain little to no analysis on whether the phrase "sex" includes "gender identity" but instead focused on whether same-sex sexual harassment constitute sex discrimination under Title IX.

Plaintiff argues that "courts across the country have recognized that excluding transgender boys and girls from sex segregated facilities that comport with their gender identity such as restrooms subjects them to discrimination on the basis of sex."  *See* ECF 40 at 11 (citing *Evancho*, *supra*; *Highland*, *supra*; and *Whitaker*, *supra*).  The cases Plaintiff cites as support, however, either relied on (and more specifically granted *Auer* deference to) the now-rescinded non-regulatory guidance issued by OCR, or, as in the case of *Evancho*, the court denied the plaintiff's motion for preliminary injunction under Title IX because of the uncertainty in the law in light of OCR's 2017 action rescinding that earlier guidance.  Although Plaintiff argues that the 2017 rescinding of the 2015 and 2016 guidance upon which the Fourth Circuit's decision in *G.G.*

---

[8] The *Evancho* court cited the following cases: *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 2016 WL 5239829 (E.D. Wisc. Sept. 22, 2016); *Bd. of Educ. of the Highland Local Sch. Dist.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Corral v. UNO Charter Sch. Network, Inc.*, 2013 WL 1855824 (N.D. Ill. May 1, 2013); *K.S. v Nw. Indep. Sch. Dist.*, 2015 WL 9319982 (E.D. Tex. Dec. 23, 2015).

was based does not affect earlier-issued guidance by OCR dating back to 2010, *see* ECF 40 at 15 n.6 and 18, that argument is unpersuasive because the same reasoning behind the 2017 rescinding of the 2015 and 2016 guidance casts doubt on the validity of the earlier guidance. *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf (rescinding 2015 and 2016 guidance because "these guidance documents do not . . . contain extensive legal analysis or explain how the position [*i.e.*, that Title IX and its regulations "require access to sex-segregated facilities based on gender identity"] is consistent with the express language of Title IX, nor did they undergo any formal public process," thus "giv[ing] rise to significant litigation" leading to divergent outcomes).

Plaintiff next argues that the Defendants' "narrow conception of boyhood does not allow for the proposition that . . . as a boy recognized by his family, doctors, friends, and others, [Plaintiff] is entitled under Title IX to be treated fully as male at school." *See* ECF 40 at 12-13. Not surprisingly, Plaintiff does not cite to any authority in support of that argument insofar as how others perceive Plaintiff has no bearing on whether Plaintiff is entitled under Title IX to use the male locker rooms.

Plaintiff next argues that, "if as defendants suggest, sex is determined by the sex assigned at birth (based, presumably on reproductive anatomy), then Title IX claims by transgender children would never be cognizable." *Id.* at 14. That argument is not only result-oriented and circular, but it also illustrates Plaintiff's attempt to have this Court legislatively amend Title IX in order to achieve Plaintiff's goal of locker room access. Continuing in the same vein, Plaintiff argues that, "[u]nder that reading, the defendants could lawfully do more than just restrict or surveil [Plaintiff's] restroom/locker room use: they could expel him and all other transgender students from school altogether, for any reason or no reason at all, without running afoul of Title

10

IX." *Id.* at 15. Perhaps so under Title IX, but that argument is a red herring because the Defendants are constrained by State law as to suspensions, expulsions, and other types of action against students that removes them from school. *See* Md. Code Ann., Educ. § 7-305; COMAR 13A.08.01.11 (setting forth the limits on the authority of school officials to suspend and expel students from school); *see also Goss v. Lopez,* 419 U.S. 565 (1975) (requiring that students be accorded due process prior to being suspended from school). Indeed, following from Plaintiff's logic, the Defendants conceivably could also suspend Plaintiff for being Caucasian without violating Title IX, but such action would be prohibited by Maryland law as well as Title VI of the Civil Rights Act of 1964.

Plaintiff next attempts to argue that Congress' inclusion of "gender identity" in the Violence Against Women Act in 2014 is irrelevant to the meaning of "sex" as contained in Title IX. *See* ECF 40 at 16 (citing *Bilski v. Kappos*, 561 U.S. 593, 645 (2010) for the proposition that "when a later statute is offered as an expression of how the Congress interpreted a statue passed by another Congress a half century before, such interpretation has very little, if any, significance"). Yet Plaintiff largely ignores the Defendants' argument that Congress did not pass bills in 2013 and 2015, entitled "The Student Non-Discrimination Act" of 2013 and 2015, respectively, which parroted the language of Title IX almost verbatim and sought to prohibit gender identity discrimination and/or harassment, arguing that "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Id.* at 17 (quoting *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001)).[9] Granted, the fact that the bills failed could have been for any number of reasons, but the question as to why they were proposed

---

[9] The relevant language of the bills were as follows: "No student shall, on the basis of actual or perceived sexual orientation or gender identity of such individual or of a person with whom the student associates or has associated, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

remains relevant.  Indeed, if Title IX prohibited gender identity discrimination, the introduction of the bills would have been completely unnecessary.

Plaintiff next turns to Title IX's implementing regulations and argues that, "[p]roperly construed within the context of the overall statutory scheme, the Regulation [*i.e.*, 34 C.F.R. § 106.33] does not authorize schools to discriminate against boys and girls who are transgender by excluding them from restrooms and locker rooms that other boys and girls use."  *See* ECF 40 at 19.  Plaintiff further argues that "[w]hen read in light of its place within the overall statutory scheme, the Regulation permits differential treatment on the basis of sex, but only so long as the differential treatment does not subject anyone to unequal discrimination in violation of the statute."  *See* ECF 40 at 19.  The plain language of the regulation at issue, however, merely provides only that schools "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  It says nothing about "unequal discrimination." To the contrary, it permits "discrimination" (in the benign sense) as long as it is equally applied.[10]

### B.  Plaintiff's Equal Protection Claims Must Be Dismissed.

In arguing that heightened scrutiny should be applied to his Equal Protection claims, Plaintiff acknowledges the numerous cases that the Defendants cited in their Motion wherein rational basis scrutiny was applied to distinctions made upon gender identity and/or transgender status.  Plaintiff discounts that authority, however (specifically, *Etsitty v. Utah Transit Admin.*, 502 F.3d 1215 (10th Cir. 2007) and *Johnston v. Univ. of Pittsburgh*, 97 F. Supp. 3d 657 (W.D.

---

[10] Title IX's regulations regarding athletic participation also permit distinctions based on physiological sex.  *See* 34 C.F.R. § 106.41(b) (providing for "separate teams for members of each sex where selection . . . is based upon competitive skill or the activity involved is a contact sport").  That distinction is plainly grounded in physiology, not one's gender identity.

Pa. 2015)), as "outlier cases" which "were largely premised on an outdated meaning of sex discrimination only that it is unlawful to discriminate against women because they are women and men because they are men." *See* ECF 40 at 23-25. Plaintiff also dismisses the District Court cases the Defendants cited which held that "transgender" is not a suspect classification under the Equal Protection Clause on the grounds that they are unreported opinions without precedential value. *Id.* at 25.

Plaintiff supports his first argument by stating that "[s]ince the Supreme Court established that sex stereotyping is a form of sex discrimination in *Price Waterhouse*, courts have repeatedly recognized that transgender people . . . are protected against discrimination that is based on the perception they do not conform to such stereotypes." *Id.* at 23 (citing *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) and *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004), both of which are sex stereotyping cases). That argument is misplaced, however, because this is not a case of alleged discrimination against Plaintiff for non-conformity to sex stereotypes, which would also arguably subject the Defendants' conduct to "heightened scrutiny." *See, e.g., Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011). Indeed, Plaintiff has not alleged that the Board's decision not to permit him access to the boys' locker room is rooted in any reason other than that he must use the locker room that corresponds with his birth sex (or else use a unisex restroom)—a standard which the Defendants apply to each student equally. And as to Plaintiff's argument regarding the lack of precedential value of unreported opinions, that argument is puzzling in light of the fact that Plaintiff cites unreported opinions in his Opposition, including in the section of his Opposition relating to his Equal Protection claims.

Plaintiff next argues that the application of "heightened scrutiny" is warranted because the Fourth Circuit has "recognized transgender people as 'a vulnerable group that has

traditionally been unrecognized, unrepresented, and unprotected.'" *Id.* at 24-25 (citing *G.G.*, 853 F.3d at 730). What Plaintiff does not make plain is that the quotation at issue is not taken from a majority opinion of the Court, but rather is taken from Judge Davis' concurring opinion to a one-page Order issued upon consideration of the Gloucester School Board's unopposed motion to vacate the preliminary injunction issued by the trial court after the Fourth Circuit's issuance of its since-vacated judgment in April 2016. Thus, at a minimum, the quote at issue is non-binding *dicta* without any precedential value. Other than Judge Davis' recent *dicta* following the remand from the Supreme Court, there is no Fourth Circuit authority imposing "heightened scrutiny."

Regardless of the level of scrutiny applied, Plaintiff next argues that the "hypothetical privacy concerns of other students" is insufficient to satisfy constitutional muster, and that the Defendants "have offered no factual basis for their privacy claims, nor could they." *Id.* at 26-27. Plaintiff's argument misses the mark because the privacy interests of others students is neither hypothetical nor fact-based. Rather, it is rooted in "universally accepted protections of privacy and safety that are based on the anatomical differences between the sexes." *G.G.*, 822 F.3d at 730 (Niemeyer, J., dissenting). Indeed, the majority in (since-vacated) *G.G.* plainly acknowledged the significant right to privacy enjoyed by public school students in locker rooms. There, the majority "agree[d] [with dissenting Judge Niemeyer] that 'an individual has a legitimate and important interest in bodily privacy such that his or her nude or partially nude body, genitalia, and other private parts' are not involuntarily exposed." *Id.* at 723. The majority reasoned away that concern given the fact that G.G. only sought access to restrooms, all of which had stalls with doors, stating: "We doubt that G.G.'s use of the communal restroom of his choice threatens the type of constitutional abuses present in the cases cited by the dissent." *Id.* at 723 n.10. Those constitutional concerns soothed but yet unaddressed, the majority reasoned that it

14

was obligated to grant *Auer* deference to OCR's interpretation of its own regulations.  *Id.* at 723.

Of course, the privacy concerns are significantly more pronounced in the instant case given that

locker room access (and by extension, shower access) is at play, and those concerns can no

longer be mitigated by the perceived obligation to defer to guidance which OCR has now

rescinded.[11]

Plaintiff decries the fact that many of the cases the Defendants cite in their Motion

"involve[e] compulsory strip searches and involuntary videotaping," but that argument actually

highlights the novelty of Plaintiff's position on this issue.  Indeed, the rise of cases involving

transgender student access to restrooms and locker rooms has basically occurred concurrent to

the facts giving rise to the instant case.

Ironically, Plaintiff acknowledges that "constitutional privacy rights . . . 'are different in

public schools than elsewhere,'" and that "public school locker rooms in this country

traditionally have been and remain 'not notable for the privacy they afford.'"  *Id.* at 28 (quoting

*Vernonia Sch. Dist. v. Action*, 515 U.S. 646 (1995)).  The Defendants respectfully submit that

---

[11] The Seventh Circuit's recent decision in *Whitaker* is also distinguishable because it too only involved restroom access.  There, the Court concluded that the plaintiff/appellee had a likelihood of success on the merits under the Equal Protection Clause with regard to the defendant/appellant school board's policy of requiring that students use the sex-segregated restrooms based upon their birth sex, reasoning:

> This policy does nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy and it ignores the practical reality of how [the plaintiff/appellee], as a transgender boy, uses the bathroom:  by entering a stall and closing the door.

> A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing their bodily functions.  Or for that matter, any other student who uses the bathroom at the same time.  Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall.  Nothing in the record suggests that the bathrooms at Tremper High School are particularly susceptible to an intrusion upon an individual's privacy.

2017 WL 2331751 at *13.  Of course, the instant case involves locker rooms, which, contrary to the restrooms at issue in *Whitaker*, Plaintiff admits "traditionally have been and remain 'not notable for the privacy they afford.'"  *See* ECF 40 at 28 (quoting *Vernonia*, 515 U.S. at 657).

15

this is all the more reason that they have set forth a sufficient governmental purpose in requiring that students use locker rooms based upon their birth sex.

In an apparent effort to argue in the alternative, Plaintiff argues that the boys' locker room is "equipped with stalls that are partitioned, or are capable of being partitioned, such that any student who wishes to disrobe in greater privacy from others students could do so." *Id.* That argument fails for two notable reasons. First, it is based on incorrect facts. *See* ECF 20-2 at 2, ¶¶ 4-6 (affidavit of Superintendent Kelly Griffith stating that, other than the two toilet stalls in the St. Michael's Middle-High School boys' locker room, there are no partitions in the locker room). Second, and no less compelling, Plaintiff's argument that the burden to seek greater privacy within the locker room or use the unisex restrooms should be on students who are uncomfortable being forced to disrobe in the presence of someone of the opposite sex tramples on the very concerns expressed by Plaintiff. Indeed, if, as Plaintiff alleges, being forced to use the unisex restroom makes Plaintiff "feel humiliated, embarrassed, and alienated from other students," *see* ECF 1 at 9, ¶ 38, why would other students not feel the same way?[12]

Plaintiff also argues that he has a right to "control the release of information of a highly personal nature"; that "[c]ompelling him to use the girls' locker rooms or the unisex bathrooms will necessarily raise scrutiny and questions from other students about why he is the only boy to do so"; and that "[e]ach of those actions potentially 'outs' [him] as transgender to students and teachers who do not otherwise know or need to know." *See* ECF 40 at 31-32. That argument, however, directly conflicts with Plaintiff's assertion, made several pages earlier, that "[n]one of [his] fellow students has expressed any objection to his use of the boys' restrooms or locker

---

[12] Compelling students to disrobe in the presence of students of the opposite physiological sex and to observe students of the opposite physiological sex disrobe in their presence implicates other constitutional concerns not addressed by Plaintiff in his Opposition, such as students' religious objection to such a situation under the First Amendment.

rooms; to the contrary, they have supported and congratulated him in obtaining access to the boys' restrooms in the wake of *G.G.*" *Id.* at 29. The foregoing begs the question: If Plaintiff has taken care not to disclose his transgender status to those who do not "need to know," how can he argue that the Defendants' concerns about the privacy of other students is merely "hypothetical" and/or "speculative"? The foregoing also contradicts the record in this case—namely, the testimony of Superintendent Griffith and former St. Michael's Middle-High School Principal Helga Einhorn, both of whom testified that they received complaints regarding the Board's current restroom policy of allowing transgender students to use the restrooms of their choice. *See* ECF 20-1 at 5, ¶ 14; ECF 20-2 at 7-8, ¶ 29.

Lastly, Plaintiff argues that the Board's decision not to permit Plaintiff access to the boys' locker room "serves no purpose other than to cater to imagined fears that other students or community members might be uncomfortable sharing spaces with transgender students[.]" *See* ECF 40 at 34. The Defendants respectfully submit that the constitutional privacy rights of other students as discussed at length in the Defendants' Motion are not based on "imagined fears." Rather, they are rooted in "custom, culture, and the very demands inherent in human nature for privacy and safety, which the separation of such facilities is designed to protect." *G.G.*, 822 F.3d at 731 (Niemeyer, J., dissenting).

In conclusion, the sexual privacy of all students is a constitutionally protected right. Participation in physical education class is required in the public schools of Maryland, and thus to permit students to use locker rooms based upon their gender identity would mean nothing less than governmental compulsion of students to expose their bodies and to be exposed to the bodies of students of the opposite birth sex in various stages of undress. The Board's requirement that students either use locker rooms based on their biological sex or use unisex restrooms as opposed

17

to the locker room based upon their gender identity so as to prevent such compulsion satisfies both rational basis scrutiny and heightened scrutiny.  Consequently, Plaintiff's rights under the Equal Protection Clause and Article 24 of the Maryland Declaration of Rights have not been violated, and Counts II and III must be dismissed.

### C. **Plaintiff's Claim Under Article 46 of the Maryland Declaration of Rights Must Be Dismissed.**

In his Opposition, Plaintiff argues that the Defendants' reliance on *Conaway v. Deane*, 401 Md. 291 (2007), is misplaced because the Defendants "conflate the concepts of sexual orientation and gender identity," and because "*Conaway* is no longer good law" in light of *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), which "uph[eld] the 'fundamental right' of same-sex couples to marry." *See* ECF 40 at 35.  Plaintiff's argument is misdirected for two reasons.

First, the Defendants did not conflate the concepts of sexual orientation and gender identity.  Rather, they merely noted that the *Conaway* Court applied rational basis scrutiny to a claim that the marriage statute at issue impermissibly discriminated against individuals based upon their sexual orientation, notwithstanding the fact that Article 46 ordinarily requires that distinctions made upon sex be subjected to strict scrutiny, on the reasoning that the Maryland General Assembly's intent in enacting Article 46 was to prohibit sex discrimination against men and women as classes.  The Defendants made the rather simple argument that, given the *Conaway* Court's reasoning that Article 46 was enacted in 1972 with the intention of prohibiting classifications based on sex but not sexual orientation, then it was also not enacted with the intention of prohibiting classifications based on gender identity or transgender status.

Second, the proposition for which the Defendants cited *Conaway* was not overruled by *Obergefell*.  *Conaway* involved the question of which level of scrutiny distinctions made upon sexual orientation are subject to under Article 46.  The *Obergefell* Court's holding had no impact

on the *Conaway* Court's holding. The law in Maryland as explained in *Conaway* remains that only distinctions made upon "sex" as that term was understood by the Maryland General Assembly in 1972 are subject to strict scrutiny, and that distinctions made upon sexual orientation (and by logical extension, gender identity) are subject to rational basis scrutiny.

In sum, rational basis scrutiny applies to Plaintiff's Article 46 claim, *Conaway*, 401 Md. at 325, and Count IV should therefore be dismissed for the same reason Counts II and III should be dismissed.

## V.    CONCLUSION.

For the reasons set forth above, the Defendants respectfully request that the Court dismiss all of Plaintiff's claims against them with prejudice.

Respectfully submitted,

s/ (filed electronically)

Edmund J. O'Meally
Federal Bar No. 04910
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland 21204
Tele:  (410) 339-6757
Fax:  (410) 832-5654
eomeally@pklaw.com

s/ (filed electronically)

Rochelle E. Eisenberg
Federal Bar No. 01204
Pessin Katz Law, P.A.
10500 Little Patuxent Parkway, Suite 650
Columbia, Maryland 21044
Tele:  (410) 339-6773
Fax:  (410) 832-5616
reisenberg@pklaw.com

s/ (filed electronically)

_____

Andrew G. Scott
Federal Bar No. 29257
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland   21204
Tele:  (410) 339-6744
Fax:   (410) 832-5627
ascott@pklaw.com

**COUNSEL FOR THE DEFENDANTS**

1931492-1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of June, 2017, a copy of the foregoing Memorandum in Reply to Opposition to Motion to Dismiss was filed in the United States District Court (Northern Division) and electronically served upon all counsel of record through the Court's CM/ECF system.

/s/ (filed electronically)

_____

Andrew G. Scott