IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

M.A.B.,                                    :

      Plaintiff,                         :

v.                                         :          Civil Action No. GLR-16-2622

BOARD OF EDUCATION OF TALBOT               :
COUNTY, et al.,
                                           :

      Defendants.                        :

## <u>**MEMORANDUM OPINION**</u>

THIS MATTER is before the Court on Defendants Board of Education of Talbot County (the "Board"), Kelly L. Griffith, and Tracy Elzey's Motion to Dismiss for Failure to State a Claim (ECF No. 36) and Plaintiff M.A.B.'s Motion for Preliminary Injunction (ECF No. 41). This action arises from Defendants' decision to require M.A.B., a transgender boy, to use restrooms and locker rooms for girls. The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will deny the Motion to Dismiss. In addition, the Court will deny without prejudice the Motion for Preliminary Injunction.

# I.    BACKGROUND[1]

M.A.B. is a fifteen-year-old boy[2] who attends high school at St. Michaels Middle High School (the "High School"), which is located in Talbot County, Maryland. (Compl. ¶ 2, ECF No. 1). His birth sex,[3] which is usually based on "the appearance of the person's external genitalia," is "female." (Id. ¶¶ 20, 21). Yet M.A.B.'s "deeply-held internal sense of his own gender," known as his gender identity, is male. (Id. ¶¶ 2, 20). "[D]eterminations of gender," unlike determinations of birth sex, are based on "multiple factors." (Id. ¶ 21). These factors include "chromosomes, hormone levels, internal and external reproductive organs, and gender identity," with gender identity being the "primary determinant" among them. (Id. ¶¶ 21, 22).

Because M.A.B. was designated female at birth but has a male gender identity, that designation does not accurately reflect his gender identity—giving him the status of a transgender boy. (Id. ¶ 20). As a result, he also has had feelings of gender dysphoria since early childhood. (Id. ¶¶ 2, 26). Gender dysphoria and "the status of being transgender" are "not synonymous," though "they are correlated." (Id. ¶ 24). Gender dysphoria is the "clinically significant distress" experienced by transgender individuals. (Id. ¶ 23). Treatment for gender dysphoria includes "social transitioning," which consists

---

[1] Unless otherwise noted, the Court takes the following facts from M.A.B.'s Amended Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

[2] Throughout the Complaint and the parties' briefing of the instant Motions, the parties have used masculine pronouns to refer to M.A.B. Accordingly, the Court will also use masculine pronouns.

[3] The Court uses terms such as "birth sex" to refer to gender designations made at birth.

of "living consistent with one's gender identity . . . in all aspects of one's life, including when accessing single-sex spaces like restrooms and locker rooms." (Id. ¶ 25).

When M.A.B. was in the sixth grade, he "arrived at the clear realization" that he was a boy. (Id. ¶¶ 2, 26). M.A.B. received a clinical diagnosis of gender dysphoria in 2014, and has been seeing a medical professional regularly for his gender dysphoria and process of gender transition. (Id. ¶ 26). When M.A.B. turned thirteen, therefore, he began to socially transition to life as male, including going by "a more traditionally masculine chosen first name." (Id. ¶ 28). The Board and the High School "took several steps" to assist M.A.B.'s social transition. (Id. ¶ 30). They addressed him by his new name, addressed him with male pronouns, and conducted a professional development workshop for its staff in 2015 on the topic of transgender students. (Id.). M.A.B. later legally changed his name. (Id. ¶ 28). Since his transition began, M.A.B. "has been generally accepted and recognized as male" by his peers at the High School. (Id. ¶ 29).

While aiding M.A.B.'s social transition in some ways, Defendants prohibited M.A.B. from using the High School's boys' locker rooms, and initially, its boys' restrooms. (Id. ¶ 31). Instead, the Board "designated" three of the High School's single-use restrooms as "gender neutral" and required M.A.B. to use them when he needed to use the restroom or change his clothes. (Id. ¶ 32). After the United States Court of Appeals for the Fourth Circuit issued its opinion in G.G. ex rel. Grimm v. Gloucester County School Board., 822 F.3d 709 (4th Cir. 2016), Defendants permitted M.A.B. to use the boys' restrooms. (Id. ¶¶ 31, 45). Since M.A.B. began using the boys' restrooms, no male students at the High School have voiced "any discomfort" about M.A.B.'s access.

(Id. ¶ 49). In fact, many of M.A.B.'s peers "congratulated him" on the Board's decision to allow M.A.B. access. (Id.).

The Board, however, continued to prohibit M.A.B. from using the boys' locker rooms. (Id. ¶¶ 31, 45). It maintained its decision to require M.A.B. to use the restrooms it designated as gender neutral whenever M.A.B. had to change his clothes (the "Policy").[4] (Id. ¶¶ 32, 45). Unlike the locker rooms, the designated restrooms the Board requires M.A.B. to use do not have benches or showers. (Id. ¶ 36). Meanwhile, the boys' locker rooms have partitioned stalls for changing clothes and partitioned stalls that have toilets and stall doors. (Id. ¶ 48).

The Board requires only M.A.B., and no other student, to change clothes in the designated restrooms. (Id. ¶ 37). This has resulted M.A.B. experiencing humiliation and embarrassment, as well as alienation from his peers. (Id. ¶ 38). He has received "weird looks" from other students when using the designated restrooms to change. (Id.). M.A.B., then, "has tried to use them as infrequently and inconspicuously as possible." (Id.).

The designated restrooms are "remotely located" from the boys' and girls' locker rooms and the gymnasium. (Id. ¶ 35). The designated restrooms also do not have lockers. (Id. ¶ 36). So, M.A.B. has to go to his student locker, which is far away from the designated restrooms, before changing his clothes, and his physical education teacher gives him extra time to change. (Id. ¶¶ 40, 41). Thus, when M.A.B. took physical

---

[4] The Court will refer to the Board's decision to prohibit M.A.B. from using the boys' locker rooms as a "policy," even though the Board simply made a decision and communicated it to M.A.B.'s counsel. (Id. ¶ 45). The High School's principal at the time later advised M.A.B. and his parents of this decision. (Id.).

education class in 2015, substitute teachers unaware of the Policy forced him to explain why he was tardy to class. (Id. ¶ 41). This required M.A.B. to disclose his transgender status to avoid disciplinary action. (Id.). The "stigma and impracticality" of changing his clothes in the designated restrooms led M.A.B. to attend physical education class without changing when he thought he would not sweat very much. (Id. ¶ 42). At times, his physical education teacher penalized M.A.B.'s grade for not changing his clothes. (Id.).

M.A.B., by and through his parents and next friends L.A.B. and L.F.B., filed the present action on July 19, 2016 against the Board, Kelly L. Griffith in her official capacity as Superintendent of Talbot County Public Schools, and Tracy Elzey in her official capacity as Principal of the High School. (ECF No. 1). In his four-count Complaint, he alleges claims under: Title IX of the Education of Amendments of 1972, 20 U.S.C. § 1681 et seq. (2018) ("Title IX") (Count I); the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Count II); Article 24 of the Maryland Declaration of Rights (Count III); and Article 46 of the Maryland Declaration of Rights (Count IV). (Id. ¶¶ 51–75). M.A.B. seeks judgment declaring that the Policy violates his rights under Title IX, the Fourteenth Amendment, and Articles 24 and 26. (Id. at 17). M.A.B. also seeks a preliminary injunction requiring Defendants to allow him to use the High School boys' locker room on the same terms as other male students. (Id.). Finally, M.A.B. seeks nominal and compensatory damages, costs, and attorneys' fees. (Id.).

Defendants now move to dismiss all counts against them for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6),

filing their Motion on April 18, 2017. (ECF No. 36). M.A.B. filed an Opposition on May 22, 2017. (ECF No. 40). Defendants filed a Reply on June 5, 2017. (ECF No. 42). M.A.B. also moves for a preliminary injunction under Rule 65, filing his Motion on May 22, 2017. (ECF No. 41). Defendants filed an Opposition on June 5, 2017. (ECF No. 43). M.A.B. filed a Reply on June 19, 2017. (ECF No. 44).

## II.    DISCUSSION

### A.    <u>Rule 12(b)(6) Standard of Review</u>

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243–44 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d

435, 439 (4th Cir. 2012)), <u>aff'd sub nom.</u>, <u>Goss v. Bank of Am., NA</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. <u>Albright v. Oliver</u>, 510 U.S. 266, 268 (1994); <u>Lambeth v. Bd. of Comm'rs of Davidson Cty.</u>, 407 F.3d 266, 268 (4th Cir. 2005) (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, <u>United Black Firefighters v. Hirst</u>, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, <u>Iqbal</u>, 556 U.S. at 678.

## B.     Rule 12(b)(6) Analysis

As a threshold matter, Defendants argue that the Court must dismiss all of M.A.B.'s claims against the Board because the Board enjoys sovereign immunity under the Eleventh Amendment to the United States Constitution. The Court disagrees.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. The Supreme Court of the United States has construed the Eleventh Amendment as also protecting states from federal court suits brought by the state's own citizens. <u>Lee-Thomas v. Prince George's Cty. Pub. Schs.</u>, 666 F.3d 244, 248 (4th Cir. 2012) (quoting <u>Port Auth. Trans-Hudson Corp. v. Feeney</u>, 495 U.S. 299, 304 (1990)). Eleventh Amendment immunity extends to "state agents and instrumentalities." <u>Id.</u> (quoting

Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997)).  As a matter of Maryland law, county school boards of education are state instrumentalities, and therefore are generally entitled to immunity under the Eleventh Amendment.  See, e.g., Farrell v. Bd. of Educ., No. GLR-16-2262, 2017 WL 1078014, at *3 (D.Md. Mar. 21, 2017) (citing Lewis v. Bd. of Educ., 262 F.Supp.2d 608, 612 (D.Md. 2003)).

Nevertheless, there are exceptions.  One exception is when a state waives its Eleventh Amendment immunity from suit in a federal court.  Lee-Thomas, 666 F.3d at 249.  The Maryland legislature enacted a statute that waived a county board of education's Eleventh Amendment immunity "for all claims in the amount of $100,000 or less."  Md.Code Ann., Cts. & Jud. Proc. § 5-518(c) (West 2018).  As interpreted by the Court of Appeals of Maryland, § 5-518(c) waives a county board of education's Eleventh Amendment immunity to suit from a plaintiff's discrimination claim under a federal law. Bd. of Educ. v. Zimmer–Rubert, 973 A.2d 233, 243 (Md. 2009).  The Court of Appeals later clarified that its interpretation of § 5-518(c) in Zimmer–Rubert applies to all "tort or insurable" claims.  Beka Indus., Inc. v. Worcester Cty. Bd. of Educ., 18 A.3d 890, 896 (Md. 2011).  Under Maryland law, the definition of "tortious act or omission" encompasses constitutional torts.  See Espina v. Jackson, 112 A.3d 442, 450 (Md. 2015) (holding that under Maryland's Local Government Tort Claims Act, "tortious acts or omissions" includes constitutional torts); see also, e.g., Green v. N.B.S., Inc., 976 A.2d 279, 287 (Md. 2009) ("[T]he term 'tort' as defined by Blacks encompasses all 'civil wrong.'" (citation omitted)).

Here, M.A.B. brings two sets of causes of action against the Board and the other Defendants: (1) a discrimination claim under Title IX (Count I); and (2) claims under the Fourteenth Amendment to the United States Constitution and associated Maryland Declaration of Rights provisions (Counts II–IV). Because § 5-518(c) waives a county board of education's Eleventh Amendment immunity from discrimination claims under federal law and the constitution, the Court concludes that such immunity does not apply to M.A.B.'s claims against the Board. Accordingly, the Court will not dismiss M.A.B.'s claims against the Board on Eleventh Amendment immunity grounds.

Defendants move to dismiss all of M.A.B.'s remaining claims for failure to state a claim under Title IX and the Fourteenth Amendment and associated state constitutional provisions. At bottom, the Court concludes that M.A.B. sufficiently states a claim under both sets of causes of action. The Court addresses each set in turn.

### 1. Title IX

Defendants contend that the Court should interpret Title IX narrowly to only prohibit discrimination on the basis of birth sex. M.A.B. replies that the Court should interpret Title IX more broadly to include discrimination on the basis of transgender status. In short, the Court agrees with M.A.B.'s interpretation of Title IX and concludes that M.A.B. has sufficiently stated a claim of sex discrimination.

### i. 34 C.F.R. § 106.33 (2017) and Transgender Status

Title IX provides, in relevant part: "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial

assistance." 20 U.S.C. § 1681(a) (2018). To allege a violation of Title IX, M.A.B. must show: "(1) that he was excluded from participation in an education program because of his sex; (2) that the educational institution was receiving federal financial assistance at the time of his exclusion; and (3) that the improper discrimination caused [M.A.B.] harm." G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd. (Grimm I), 822 F.3d 709, 718 (4th Cir. 2016), vacated, 137 S.Ct. 1239 (2017).[5]

Title IX does not prohibit all distinctions on the basis of sex. Id. Under one of Title IX's implementing regulations, 34 C.F.R. § 106.33 (2017), Title IX permits separating toilets, locker rooms, and shower facilities on the basis of sex as long as they are "comparable." Grimm I observed that "[b]y implication," then, § 106.33 permits schools to exclude those with a birth sex of female from male facilities and vice-versa. 822 F.3d at 720.

Defendants maintain that because § 106.33 refers to males and females unambiguously, the Court must interpret Title IX to apply only to discrimination on the

---

[5] The Supreme Court vacated the Fourth Circuit's judgment in Grimm I in light of the United States Department of Education and United States Department of Justice issuing a letter withdrawing the guidance documents that the judgment examined. See 137 S.Ct. at 1239; see also U.S. Dep't of Just. Civil Rights Div. & U.S. Dep't of Educ. Office for Civil Rights, Dear Colleague Letter (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf. Grimm I remains binding law of the Fourth Circuit, however, "unless it is overruled by a subsequent en banc opinion of [the Fourth Circuit] or a superseding contrary decision of the Supreme Court." United States v. Giddins, 858 F.3d 870, 886 n.12 (4th Cir. 2017) (quoting United States v. Collins, 415 F.3d 304, 311 (4th Cir. 2005)). There has been neither an en banc Fourth Circuit opinion nor a superseding contrary Supreme Court decision overruling Grimm I. Thus, the Court will rely on Grimm I to the extent it offers guidance for deciding issues the Motions present.

basis of birth sex, and does not prohibit discrimination on the basis of transgender status. The Court disagrees.

As Grimm I observed, the Court's "inquiry is not ended" by § 106.33's reference to males and females. Id. "Although the regulation may refer unambiguously to males and females, it is silent as to how a school should determine whether a transgender individual is a male or female for the purpose of access to sex-segregated restrooms." Id.; see also Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1047 (7th Cir. 2017) ("Neither [Title IX] nor [its] regulations define the term 'sex.' Also absent from the statute is the term 'biological,' which [the defendant school district] maintains is a necessary modifier.").

The Fourth Circuit went on to hold that a January 7, 2015 opinion letter by the Department of Education's Office for Civil Rights, which interpreted the regulation to require access to sex-segregated facilities be based on gender identity (the "2015 Opinion Letter"), is entitled to deference under Auer v. Robbins, 519 U.S. 452 (1997). Id. But on February 22, 2017, after the Fourth Circuit decided Grimm I, the Department of Education and the Department of Justice issued a guidance document withdrawing the 2015 Opinion Letter. U.S. Dep't of Just. Civil Rights Div. & U.S. Dep't of Educ. Office for Civil Rights, Dear Colleague Letter (Feb. 22, 2017), https://www2.ed.gov/about/ offices/list/ocr/letters/colleague-201702-title-ix.pdf. Thus, with the 2015 Opinion Letter no longer in effect, Grimm I no longer resolves how § 106.33 applies to a transgender student.

The Fourth Circuit has not spoken on how § 106.33 applies to a transgender person since Grimm I. And the Supreme Court has never addressed the issue. It is well-settled within the Fourth Circuit, however, that case law interpreting Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e et seq. (2018), guides courts in evaluating a Title IX claim. Grimm I, 822 F.3d at 718 (citing Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007)).[6] Accordingly, the Court turns to Title VII precedent for guidance.

### ii.    Title VII and Transgender Status

The Supreme Court has never addressed how Title VII applies to transgender individuals. Nevertheless, other Supreme Court cases interpreting Title VII provide helpful guidance. In Price Waterhouse v. Hopkins, the Supreme Court held that plaintiff Hopkins, a woman who was denied partnership in an accounting firm, had an actionable claim against that firm because the firm denied her a promotion for failing to conform to gender stereotypes. 490 U.S. 228, 250–53 (1989). Various firm partners described Hopkins as "macho," in need of "a course in charm school," "a lady using foul language," and someone who had been "a tough-talking somewhat masculine hard-nosed manager." Id. at 235. Partners advised her that she could improve her chances for partnership if she were to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." Id. (internal quotation marks omitted).

---

[6] For this reason, Defendants' various arguments about why the "very different natures" of Title VII and Title IX precludes reliance on Title VII precedent have no merit. (Defs.' Reply at 3, ECF No. 42).

Writing for a plurality, Justice Brennan held that "[i]n the specific context of sex stereotyping," these comments were sufficient to show that the accounting firm "acted on the basis of gender" when it denied Hopkins a promotion.  Id. at 250.  In doing so, six members of the Court agreed that Title VII barred not only discrimination because Hopkins was a woman, but also for "sex stereotyping" because she failed to act according to the gender stereotype of a woman.  Id. at 250–51; id. at 258–61 (White, J., concurring); id. at 272–73 (O'Connor, J., concurring).  Thus, Price Waterhouse establishes that Title VII's prohibition on discrimination because of sex includes—more broadly—gender stereotyping.  See id. at 251 ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group.").

After Price Waterhouse, the Supreme Court confirmed this broader interpretation of Title VII in Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998).  There, the Court held that Title VII's prohibition of sex discrimination is broad enough to include same-sex harassment claims.  Id. at 79.  Justice Scalia, writing for a unanimous Court, observed that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  Id.

The Fourth Circuit has not applied Price Waterhouse in the context of claims brought by transgender persons, or gender stereotyping claims more generally, under Title VII.  But see G.G. v. Gloucester Cty. Sch. Bd. (Grimm II), 654 F.App'x 606, 606–07 (4th Cir. 2016) (Davis, J., concurring) (observing that the Supreme Court "has

expressly recognized" that "failure to conform" to gender stereotypes constitutes sex discrimination under Title VII (citing Price Waterhouse, 490 U.S. at 250–51)). Still, this Court has concluded that discrimination on the basis of transgender status constitutes gender stereotyping because "by definition, transgender persons do not conform to gender stereotypes." Finkle v. Howard Cty., 12 F.Supp.3d 780, 787–88 (D.Md. 2014). As a result, transgender discrimination is per se actionable sex discrimination under Title VII based on Price Waterhouse. Id.

This Court's conclusion is in accord with the First, Sixth, Ninth, and Eleventh Circuits, which have all recognized that claims of discrimination on the basis of transgender status is per se sex discrimination under Title VII or other federal civil rights laws based on Price Waterhouse. See EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc., ___ F.3d ___, 2018 WL 1177669, at *5–12 (6th Cir. Mar. 7, 2018) (Title VII); Glenn v. Brumby, 663 F.3d 1312, 1316–19 (11th Cir. 2011) (Title VII); Rosa v. Park W. Bank & Tr. Co., 214 F.3d 213, 215–16 (1st Cir. 2000) (Equal Credit Opportunity Act); Schwenk v. Hartford, 204 F.3d 1187, 1201–03 (9th Cir. 2000) (Gender Motivated Violence Act); see also Smith v. City of Salem, 378 F.3d 566, 575 (6th Cir. 2004) (holding that "sex stereotyping based on a person's gender non-conforming behavior" is unlawful under Title VII); Grimm II, 654 F.App'x at 607 (Davis, J., concurring) (noting that Glenn, Rosa, Schwenk, and Smith "have all recognized that discrimination against a transgender

individual based on that person's transgender status is discrimination because of sex under federal civil rights statutes").[7]

In addition, more generally, the First, Second, Third, Seventh, and Ninth Circuits have all recognized that an allegation of gender stereotyping is actionable sex discrimination under Title VII based on Price Waterhouse. See Hively v. Ivy Tech Cmty. Coll., 853 F.3d 339, 351–52 (7th Cir. 2017) (en banc); Christiansen v. Omnicom Grp., Inc., 852 F.3d 195, 200–01 (2d Cir. 2017) (per curiam); Prowel v. Wise Bus. Forms, Inc., 579 F.3d 285, 290 (3d Cir. 2009); Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 874–75 (9th Cir. 2001); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261 n.4 (1st Cir. 1999).[8] What is more, no Court of Appeals has held otherwise.

Thus, on the basis of the Supreme Court's holding in Price Waterhouse, subsequent opinions of several Courts of Appeals, and this Court's opinion in Finkle, the Court concludes that allegations of gender stereotyping are cognizable as sex-

---

[7] The only Courts of Appeals that arguably have held to the contrary are the Seventh, Eighth, and Tenth Circuits' rulings that transgender status, taken alone, is not entitled to Title VII protection. See Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1221–22 (10th Cir. 2007); Sommers v. Budget Mktg., Inc., 667 F.2d 748, 749–50 (8th Cir. 1982); Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1084 (7th Cir. 1984).

As this Court has noted, however, "it is unclear what, if any, significance to ascribe" to these holdings because "[i]n light of Price Waterhouse," transgender individuals may bring sex-discrimination claims under a gender-stereotyping theory. Finkle, 12 F.Supp.3d at 788. Indeed, the Seventh Circuit recently explained that its prior decision in Ulane "cannot and does not foreclose" transgender students from bringing sex-discrimination claims based on Price Waterhouse's gender-stereotyping theory. Whitaker, 858 F.3d at 1047.

[8] As a matter of fact, Defendants appear to agree that under Title VII, sex-discrimination claims under a gender-stereotyping theory are cognizable based on Price Waterhouse. (See Defs.' Reply at 7) (". . . [T]he Supreme Court has recognized since [Price Waterhouse] that gender[-]stereotype discrimination may be evidence of sex discrimination.").

discrimination claims under Title VII, and consequently, Title IX. The Court further concludes, on the basis of Finkle and several Courts of Appeals decisions, that claims of discrimination on the basis of transgender status are per se actionable under a gender stereotyping theory.

### iii.     The Policy under a Gender-Stereotyping Theory

Having determined that M.A.B. may bring a claim of discrimination under Title IX on the basis of his transgender status, the Court turns to whether M.A.B. has sufficiently alleged his claim under a gender-stereotyping theory. In brief, the Court concludes that M.A.B. has done so.

M.A.B. asserts that under a gender-stereotyping theory, the alleged Policy subjects him to sex discrimination. Defendants submit that even under a gender-stereotyping theory, M.A.B. fails to state a claim. M.A.B. has not alleged that Defendants denied M.A.B. access to the boys' locker rooms "because of the way he dresses, talks, acts, or any other outward expression," as in Price Waterhouse. (Defs.' Reply at 7). Defendants highlight that unlike Price Waterhouse, the Policy is "based on biology alone." (Id. at 8).[9] The Court agrees with M.A.B.

Defendants' argument is unavailing because they define gender stereotyping too narrowly. Granted, the employer in Price Waterhouse did deny the plaintiff a promotion because her appearance and behavior did not conform to the employer's gender

_____

[9] Defendants also advance this argument in an attempt to distinguish this Court's opinion in Finkle. For the reasons stated below, this argument is unavailing. See Finkle, 12 F.Supp.3d at 788 (concluding that the plaintiff stated a Title VII claim because she alleged that defendants discriminated against her because of her transgender status without relying on the particular form of the discrimination).

stereotype of a woman. Yet the Supreme Court did not require gender stereotyping to take the specific form of discrimination on the basis of appearance or behavior. In fact, Price Waterhouse forecloses Defendants' argument because it explicitly left open the possibility of other forms of gender stereotyping: "By focusing on [appearance and behavior], however, we do not suggest a limitation on the possible ways of proving that stereotyping played a motivating role in an employment decision . . ." 490 U.S. at 251–52; see also id. at 251 (observing that Congress intended "to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes" when it enacted Title VII (quoting L.A. Dep't. of Water & Power v. Manhart, 435 U.S. 702, 707, n.13 (1978)) (emphasis added)). Thus, the Court will not limit its analysis to whether M.A.B. alleges that Defendants discriminated against him based on his appearance or behavior.

The Court concludes that the alleged Policy subjects M.A.B. to sex discrimination under a gender stereotyping theory because he has alleged that Defendants denied him access to the boys' locker room because he is transgender.

Since the 2015 Opinion Letter was withdrawn, only one United States Courts of Appeals, the Seventh Circuit, has addressed whether denying transgender students access to the sex-segregated facility that aligns with their gender identity may violate Title IX. In Whitaker by Whitaker v. Kenosha Unified School District. No. 1 Board of Education, a recent decision with very similar facts, the court held that the plaintiff, a transgender boy, was entitled to a preliminary injunction granting him access to the boys' restrooms. 858 F.3d 1034 (7th Cir. 2017).

In <u>Whitaker</u>, the plaintiff was a high school student in his senior year. <u>Id.</u> at 1040. His birth certificate designated him as female, but his gender identity is male. <u>Id.</u> He began to see a therapist during his freshman year of high school, who diagnosed him with gender dysphoria, and socially transition to life as male. <u>Id.</u> His social transition included using a different name, asking his teachers and peers to refer to him by that name and to use male pronouns, and changing his legal name. <u>Id.</u> The school's administration decided, nonetheless, that the plaintiff could only use the girls' restrooms or gender-neutral restrooms, which were far from his classrooms. <u>Id.</u> at 1040, 1041–42. As a result of the administration's decision, he suffered from depression and anxiety. <u>Id.</u> at 1041. The plaintiff even restricted his water intake to avoid using the restroom, which exacerbated medical problems. <u>Id.</u> at 1040–42. He also contemplated suicide. <u>Id.</u> at 1041. The school later required the student to complete a surgical transition before permitting him access to the boys' restrooms. <u>Id.</u> Despite the school's prohibition, the plaintiff used the boys' restrooms in violation of the administration's decisions, causing administrators to remove him from class on several occasions and instruct security guards to monitor his restroom usage. <u>Id.</u> at 1041.

In assessing the student's likelihood of success on the merits on his Title IX claim, <u>Whitaker</u> reasoned that "[b]y definition, a transgender individual does not conform to the sex-based stereotypes" associated with the individual's birth sex. <u>Id.</u> at 1048. Relying on the logic of Title VII gender stereotyping cases—including <u>Price Waterhouse</u>, <u>Oncale</u>, the Eleventh Circuit's opinion in <u>Glenn</u>, and the Sixth Circuit's opinion in <u>Smith</u>—the Seventh Circuit concluded that discrimination on the basis of transgender status itself

constitutes gender stereotyping. Id. at 1048. Thus, the student had demonstrated a likelihood of success on the merits of his Title IX claim because he alleged that the school district "denied him access to the boys' restroom because he is transgender." Id.

The court explained that a "policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." Id. at 1049. Moreover, the school district's decision barring the student from the boys' restrooms unlawfully subjects him, "as a transgender student, to different rules, sanctions, and treatment than non-transgender students." Id. at 1048–49.

Here, "[b]y definition" as a transgender boy, M.A.B. "does not conform to the sex-based stereotypes" associated with being assigned female at birth. Id. at 1048. So, as in Whitaker, M.A.B.'s allegation that Defendants "denied him access" to the boys' locker room "because he is transgender" sufficiently states a Title IX claim for gender stereotyping. See id. at 1048.

The main difference between the policy in Whitaker and Defendants' policy here is that the school administrators in Whitaker barred the student from the boys' restrooms, whereas here, Defendants barred M.A.B. from the boys' locker room.[10] See, e.g., id. at 1041. That difference does not change the Court's Title IX analysis. Like the policy in Whitaker, Defendants' policy of barring M.A.B. from the boys' locker room requires him to use a facility that "does not conform" with his gender identity. See id. at 1049. The Policy, then, "punishes" M.A.B. for his "gender non-conformance, which in turn violates

---

[10] As described above, however, Defendants also barred M.A.B. from the boys' restrooms until the Fourth Circuit issued its opinion in Grimm I. (Compl. ¶¶ 31, 45).

Title IX." See id. And most notably, like the policy in Whitaker, Defendants' decision to bar M.A.B. from the boys' locker room subjects him, "as a transgender student, to different rules, sanctions, and treatment than non-transgender students." See id. at 1049– 50.[11]

The Court, therefore, concludes that M.A.B. has sufficiently stated a claim for gender-stereotyping discrimination because he alleges that Defendants "denied him access" to the boys' locker room "because he is transgender." See id. at 1049. As such, the Court will not grant Defendants' Motion as to M.A.B.'s Title IX claim. The Court now turns to M.A.B.'s constitutional claims.

## 2. Constitutional Claims

M.A.B. brings claims under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Articles 24 and 26 of the Maryland Declaration of Rights. (Compl. ¶¶ 61–75). Defendants argue that the Court should dismiss M.A.B.'s constitutional claims because M.A.B. does not allege that Defendants have treated him differently than any other students at the High School. Defendants further contend that transgender status is not a suspect class under the Equal Protection Clause, and, accordingly, the Policy requires and survives rational basis review.

M.A.B. responds that the Court should apply intermediate scrutiny rather than rational basis review because the Policy constitutes a form of sex discrimination and

_____

[11] Defendants attempt to distinguish Whitaker by highlighting that M.A.B. makes no allegation that Defendants "have sex-stereotyped [him] based on his outward expression." (Reply at 8 n.7). But neither did the plaintiff in Whitaker. 858 F.3d at 1048 (describing the school district's argument that the policy the student alleges "is not based on whether the student behaves, walks, talks, or dresses in a manner that is inconsistent" with any gender stereotypes (emphasis added)).

because transgender status is a quasi-suspect classification. M.A.B. further submits that the Policy does not withstand intermediate scrutiny because it is not substantially related to an important government interest. At bottom, the Court agrees with M.A.B.

The Equal Protection Clause provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In simpler terms, "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)). Likewise, the state must avoid distinguishing between classes of people in an "arbitrary or irrational" manner or out of a "bare . . . desire to harm a politically unpopular group." Id. at 446–47 (quoting USDA v. Moreno, 413 U.S. 528, 534 (1973)); see also Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) (prohibiting "intentional and arbitrary discrimination" (quoting Sioux City Bridge Co. v. Dakota Cty., 260 U.S. 441, 445 (1923))).

Generally, courts presume state action to be lawful, and so, uphold classifications as long as they are "rationally related to a legitimate state interest." Cleburne, 473 U.S. at 440. This is known as "rational basis review." See, e.g., Clark v. Jeter, 486 U.S. 456, 461 (1988). Conversely, when the state classifies a "suspect" or "quasi-suspect" group of people, courts apply "heightened scrutiny." Cleburne, 473 U.S. at 440–41. Heightened scrutiny, unlike rational basis review, is "a more exacting standard of judicial review." Id. at 442.

One quasi-suspect class is sex. Sex-based classifications require heightened scrutiny because sex "frequently bears no relation to the ability to perform or contribute

to society." Id. at 440–41 (quoting Frontiero v. Richardson, 411 U.S. 677, 686 (1973) (plurality opinion)). For classifications based on sex, courts apply an "intermediate" form of heightened scrutiny. See, e.g., Clark, 486 U.S. at 461. Intermediate scrutiny requires the state to show that its justification for the classification is "exceedingly persuasive." United States v. Virginia, 518 U.S. 515, 533 (1996).

### i.    Proper Level of Scrutiny

As a preliminary matter, the parties disagree over whether rational basis review or heightened scrutiny applies to the Policy. Defendants maintain that the more deferential rational basis review applies, while M.A.B. asserts that the more rigorous intermediate scrutiny applies. As with M.A.B.'s Title IX claim, neither the Supreme Court, nor the Fourth Circuit, has decided the rights of transgender people under the Equal Protection Clause.[12] Based on the weight of decisions issued by other Courts of Appeals and recent decisions issued by sister United States District Courts, the Court concludes that the Policy warrants heightened scrutiny for two reasons. First, the Policy is a sex-based classification. Second, transgender status itself is at least a quasi-suspect classification.

### a.    Transgender Discrimination as Sex-Based Discrimination

Only two Courts of Appeals have considered whether transgender classifications are sex-based, and, consequently, are deserving of intermediate scrutiny—the Seventh Circuit and the Eleventh Circuit. See Whitaker, 858 F.3d at 1051; Glenn, 663 F.3d at 1316. Both concluded that intermediate scrutiny applies. Whitaker, 858 F.3d at 1051; Glenn, 663 F.3d at 1316; see also Smith, 378 F.3d at 577 (holding that the plaintiff, a

---

[12] Grimm I declined to consider the plaintiff's claim under the Equal Protection Clause. 822 F.3d at 717 n.3.

transgender firefighter, sufficiently stated a claim of sex discrimination under the Equal Protection Clause without further specifying the level of scrutiny that applied).

As the Seventh Circuit explained, if the state cannot justify a sex-based classification "by relying on overbroad generalizations," then "sex-based stereotypes are also insufficient" to justify such a classification. Whitaker, 858 F.3d at 1051; see also J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 138 (1994) (rejecting, as a proper reason for discrimination during jury selection, reliance on sex-based stereotypes). Because the court had already concluded that the policy barring the student from the boys' restrooms constitutes gender stereotyping under Title IX, the Whitaker court held that "[i]t is enough to say that, just as in Price Waterhouse," such a policy and related facts in the record "show[ ] sex stereotyping" under the Equal Protection Clause. Id. at 1051. The school district's policy "cannot be stated without referencing sex" because the school district "decides which bathroom a student may use based upon the sex listed on the student's birth certificate." Id. Thus, Whitaker held that the policy "is inherently based upon a sex-classification" and intermediate scrutiny applies. Id.

Similarly, the Eleventh Circuit in Glenn held that classifications on the basis of transgender status are sex-based classifications. Relying on a variety of Supreme Court decisions, the court pointed out that "the consistent purpose" of applying intermediate scrutiny to sex-based classifications "has been to eliminate discrimination on the basis of gender stereotypes." Glenn, 663 F.3d at 1319–20.[13] The court reasoned that "[b]ecause these protections are afforded to everyone, they cannot be denied to a transgender

---

[13] Glenn expressly rejected making a distinction between describing this kind of discrimination "as being on the basis of sex or gender." 663 F.3d at 1317.

individual." Id. at 1319. Glenn then held that such protections apply when there is discrimination on the basis of transgender status: a "person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." Id. at 1316. "[D]iscrimination against a transgender individual because of her gender-nonconformity," therefore, "is sex discrimination" under the Equal Protection Clause. Id. at 1317.

Here, the Policy is a sex-based classification because it relies on sex-based stereotypes. The Policy classifies M.A.B. differently on the basis of his transgender status, and, as a result, subjects him to sex stereotyping. For the same reasons why the Court concluded that the Policy impermissibly stereotypes under Title IX, "[i]t is enough to say that, just as in Price Waterhouse," the Policy M.A.B. alleges exists "shows sex stereotyping" under the Equal Protection Clause. Whitaker, 858 F.3d at 1051. Likewise, the Equal Protection Clause protects M.A.B. from "discrimination on the basis of gender stereotypes," and because the Policy classifies M.A.B. on the basis of his transgender status, it constitutes "sex discrimination." Glenn, 663 F.3d at 1317, 1319. Further, like the policy in Whitaker, Defendants' decision to bar M.A.B. from the boys' locker room "cannot be stated without referencing sex" because they decide which locker room M.A.B. may use based upon his birth sex—female. See 858 F.3d at 1051.

The Policy, therefore, is subject to heightened scrutiny because as alleged, it relies on sex-based stereotypes.

### b.      Transgender People as a Quasi-Suspect Class

Second, the Policy warrants heightened scrutiny because it classifies M.A.B. on the basis of his transgender status.  Classifications based on transgender status require heightened scrutiny because transgender individuals are, at minimum, a quasi-suspect class.

The Supreme Court uses certain factors to decide whether a new classification requires heightened scrutiny.  They include: (1) whether the class has been historically "subjected to discrimination," Bowen v. Gilliard, 483 U.S. 587, 602 (1987) (citation omitted); (2) whether the class has a defining characteristic that "frequently bears [a] relation to ability to perform or contribute to society," Cleburne, 473 U.S. at 440–41; (3) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group;" Bowen, 483 U.S. at 602 (citation omitted); and (4) whether the class is "a minority or politically powerless." Id.

Here, all four factors justify treating transgender people as at least a quasi-suspect class.  First, transgender people have been historically subjected to discrimination.  For instance, Whitaker observed that "[t]here is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."  858 F.3d at 1051.  Indeed, recent reports found that transgender individuals suffer very high rates of violence due to their transgender status.  In a 2015 survey of transgender individuals, 9% of survey respondents reported that they were physically attacked in the past year because of their transgender status.  Sandy E. James et al., Nat'l Ctr. for Transgender Equal., The Report of the 2015 U.S. Transgender Survey 198 (2016), https://transequality.org/sites/

default/files/docs/usts/USTS-Full-Report-Dec17.pdf.  Meanwhile, at least 25 transgender persons in the United States were homicide victims in 2017, the highest annual total on record.  Mark Lee, Human Rights Campaign Found., <u>A Time to Act: Fatal Violence Against Transgender People in America 2017</u> 4 (2017), https://assets2.hrc.org/files/assets/resources/A_Time_To_Act_2017_REV3.pdf.

Tantamount here is the discrimination they face in the context of K-12 education:

> 78% of students who identify as transgender or as gender non-conformant[ ] report being harassed while in grades K–12.  Jaime M. Grant et al., <u>Injustice at Every Turn: A Report of the National Transgender Discrimination Survey</u>, Nat'l Center for Transgender Equal., at 33 (2011), http://www.transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf.  These same individuals in K–12 also reported an alarming rate of assault, with 35% reporting physical assault and 12% reporting sexual assault.  <u>Id.</u>  As a result, 15% of transgender and gender non-conformant students surveyed made the decision to drop out.  <u>Id.</u>  These statistics are alarming.

<u>Whitaker</u>, 858 F.3d at 1051.  And as other district courts have recognized, transgender individuals report high rates of discrimination in education, employment, housing, and access to healthcare.  <u>Evancho v. Pine-Richland Sch. Dist.</u>, 237 F.Supp.3d 267, 288 (W.D.Pa. 2017); <u>Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.</u>, 208 F.Supp.3d 850, 874 (S.D. Ohio 2016); <u>Adkins v. City of New York</u>, 143 F.Supp.3d 134, 139 (S.D.N.Y. 2015).

Second, transgender status bears no relation to ability to contribute to society.  The Court is not aware of any argument suggesting that a transgender person or person experiencing gender dysphoria is any less productive than any other member of society.

Accord Evancho, 237 F.Supp.3d at 288; Highland, 208 F.Supp.3d at 874; Norsworthy v. Beard, 87 F.Supp.3d 1104, 1120 (N.D. Cal. 2015); Adkins, 143 F.Supp.3d at 139.

Third, transgender individuals exhibit "obvious, immutable, or distinguishing characteristics that define them as a discrete group." See Bowen, 483 U.S. at 602 (quoting Lyng v. Castillo, 477 U.S. 635, 638 (1986)). As several district courts have concluded, transgender status is immutable. Evancho, 237 F.Supp.3d at 288; Highland, 208 F.Supp.3d at 874 (quoting Lyng, 477 U.S. at 638); Norsworthy, 87 F.Supp.3d at 119 n.8; Adkins, 143 F.Supp.3d at 139. They have, moreover, distinguishing characteristics—mainly, their gender identity does not align with the gender they were assigned at birth. (Compl. ¶ 20).

Fourth, as a class, transgender people are "a minority or politically powerless." Bowen, 483 U.S. at 602 (quoting Lyng, 477 U.S. at 638). They comprise of a small fraction of the population. Doe 1 v. Trump, 275 F.Supp.3d 167, 209 (D.D.C. 2017) (highlighting an amicus party's estimate that transgender people make up approximately 0.6% of the American adult population); Highland, 208 F.Supp.3d at 874 (describing transgender people as "a tiny minority of the population").

They are also politically powerless. Courts have had to block enforcement of policies approved by the federal government or laws passed by state legislatures because they violated the rights of transgender individuals. Notably, just months ago, this Court enjoined enforcement of a memorandum issued by President Trump that permitted discrimination against transgender members of the military because it likely violated their rights under the Equal Protection Clause. Stone v. Trump, No. MJG-17-2459, ___

F.Supp.3d ___, 2017 WL 5589122, at *14–17 (D.Md. Nov. 21, 2017); see also Doe 1, 275 F.Supp.3d 167 (enjoining implementation of two of the memorandum's directives). In 2016, a sister district court within the Fourth Circuit enjoined North Carolina from enforcing a so-called "bathroom bill" requiring individuals to use bathrooms that align with their birth sex because it likely violated Title IX. Carcaño v. McCrory, 203 F.Supp.3d 615 (M.D.N.C. 2016).

Relatedly, there are very few transgender elected officials. Only two openly transgender candidates have ever been elected; both won seats in a state legislature. Maggie Astor, Danica Roem Wins Virginia Race, Breaking a Barrier for Transgender People, N.Y. Times, Nov. 7, 2017, https://www.nytimes.com/2017/11/07/us/danica-roem-virginia-transgender.html. The first never took office, and the second was just elected last November. Id. Nor are there any openly transgender members of the United States Congress or the federal judiciary.[14] Adkins, 143 F.Supp.3d at 140; see also G.G. v. Gloucester Cty. Sch. Bd. (Grimm III), 853 F.3d 729, 730 (4th Cir. 2017) (Davis, J., concurring), as amended (Apr. 18, 2017) (observing that transgender people are a "vulnerable group that has traditionally been unrecognized, unrepresented, and unprotected").

The Court, therefore, concludes that classifications based on transgender status are per se entitled to heightened scrutiny because transgender status itself is at least a quasi-

---

[14] For that matter, the Court observes that one judicial nominee to the United States District Court for the Eastern District of Texas described a first grade transgender student's lawsuit to access the girls' restroom as part of "Satan's plan." Chris Massie & Andrew Kaczynski, Trump Judicial Nominee Said Transgender Children are Part of 'Satan's Plan,' Defended 'Conversion Therapy', CNN Politics (Sept. 20, 2017), http://www.cnn.com/2017/09/20/politics/kfile-jeff-mateer-lgbt-remarks/index.html.

suspect class.  Transgender people have been historically subjected to discrimination, their status bears no relation to their ability to contribute to society, they exhibit immutable and distinguishing characteristics, and they are both a minority and politically powerless.

What is more, this Court in Stone recently concluded that transgender status deserves "at least a quasi-suspect classification."  2017 WL 5589122, at *15 (citing Doe 1, 275 F.Supp.3d at 208–09).

Most district courts that have considered the issue came to the same conclusion. Compare Doe 1, 275 F.Supp.3d at 208 (concluding that classifications on the basis of transgender status are "at least a quasi-suspect classification"); Evancho, 237 F.Supp.3d at 288 (concluding that transgender status is a classification requiring heightened scrutiny); Highland, 208 F.Supp.3d at 874 (same); Adkins, 143 F.Supp.3d at 139–40 (same); and Norsworthy, 87 F.Supp.3d at 1119 (same), with Johnston v. Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ., 97 F.Supp.3d 657, 668 (W.D.Pa. 2015) (declining to recognize transgender status as a class entitled to heightened scrutiny because neither the Supreme Court nor the United States Court of Appeals for the Third Circuit have ruled otherwise).[15]

_____

[15] The only Court of Appeals to address the issue, the Ninth Circuit in Holloway v. Arthur Andersen & Co., held that transgender people were not a suspect or quasi-suspect class.  566 F.2d 659, 663 (9th Cir. 1977).  The Ninth Circuit later raised significant doubt as to whether Holloway remains good law.  See Schwenk v. Hartford, 204 F.3d 1187, 1201 (9th Cir. 2000) ("The initial judicial approach taken in cases such as Holloway has been overruled by the logic and language of Price Waterhouse.").  In Whitaker, the Seventh Circuit expressly declined to consider whether transgender status is per se entitled to heightened scrutiny.  See 858 F.3d at 1051 ("[T]his case does not require us to

In short, the Policy is subject to heightened scrutiny. The Policy, as alleged, relies on sex-based stereotypes, warranting heightened scrutiny. Further, transgender status itself is at least a quasi-suspect classification.

## ii.     The Policy under Heightened Scrutiny

Having concluded that the Court must examine the Policy by applying heightened scrutiny, the question remains whether the Policy withstands this review. At bottom, the Court concludes that, for the purpose of deciding the pending Motion to Dismiss, the Policy fails heightened scrutiny.

As mentioned above, sex-based classifications require an intermediate form of heightened scrutiny, which requires the state to show that the justification for the classification is "exceedingly persuasive." Virginia, 518 U.S. at 533. An exceedingly persuasive justification requires the state to demonstrate that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." Virginia, 518 U.S. at 533 (quoting Miss. Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)) (internal quotation marks omitted). "The justification must be genuine," and one that is "hypothesized or invented post hoc in response to litigation" is not sufficient. Id. at 533. Nor can the justification rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." Id.

The Seventh Circuit in Whitaker is the only United States Courts of Appeals that has addressed whether a policy that denies transgender students access to the sex-

reach the question of whether transgender status is per se entitled to heightened scrutiny.").

segregated facility that aligns with their gender identity violates the Equal Protection Clause. There, the defendant school district defended its policy by first arguing that the policy does not implicate the Equal Protection Clause because it treats all boys and girls the same. Whitaker, 858 F.3d at 1051. It further asserted that the policy is necessary to protect the privacy rights of all of the district's students. Id. at 1052. The court rejected both arguments. Id. at 1051, 1052.

Whitaker held that the school district's contention that "it treats all boys and girls the same" is "untrue." Id. at 1051. Under the policy, if transgender students choose to use a bathroom that aligns with their gender identity, the school district disciplines them. Id. As a result, the policy implicates the Equal Protection Clause. Id. at 1051–52.

In assessing the plaintiff student's likelihood of success on the merits of his claim under intermediate scrutiny, Whitaker held that the record demonstrated that the school district's privacy justification, though "legitimate," was not "genuine" because it was "based upon sheer conjecture and abstraction." Id. at 1052. The court highlighted that the student used the boys restrooms without "incident or complaint" from other students. Id.

Nor, the court held, was the policy substantially related to protecting other students' privacy rights. Preventing the student from using the boys' restrooms "does nothing to protect the privacy rights" the school district sought to protect. Id. The court explained that a "transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing

their bodily functions." Id. In addition, "those who have true privacy concerns are able to utilize a stall," and "[n]othing in the record suggests that the bathrooms at [the high school] are particularly susceptible to an intrusion upon an individual's privacy." Id. Further, Whitaker pointed out that if the school district was concerned that children with different-looking anatomies were in the bathroom together, "then it would seem that separate bathrooms also would be appropriate for pre-pubescent and post-pubescent children who do not look alike anatomically," which the school district had not provided. Id. at 1052–53. Thus, the court held that the school district did not establish an exceedingly persuasive justification. Id. at 1053.

Here, Defendants make very similar arguments to the ones Whitaker rejected. Defendants contend that the Policy does not implicate the Equal Protection Clause because it treats M.A.B. like every other student at the High School. The Policy requires him to use the locker room of his birth sex. Defendants further maintain that even under intermediate scrutiny, the Policy survives because it protects the privacy rights of the High School's students. The Court disagrees.

The Policy clearly implicates the Equal Protection Clause. It treats M.A.B. differently from the rest of the High School's students. While the rest of M.A.B.'s peers may use the locker room that aligns with their gender identity, M.A.B. may not. Instead, Defendants discipline M.A.B. if he uses such a locker room—the boys' locker room. As a matter of fact, his physical education teacher penalized his grade when M.A.B. did not change his clothes because he did not want to deal with the "stigma and impracticality" of changing in the designated restrooms. (Compl. ¶ 42). Also, M.A.B. had to disclose

his transgender status to substitute teachers to avoid disciplinary action for being late to class after changing in those distant restrooms. (Id. ¶ 41). None of these events would occur if the Policy permitted M.A.B. to change in the locker room that aligns with his gender identity, like the rest of the students at the High School. Thus, the Policy implicates the Equal Protection Clause.

The Court concludes that the Policy does not withstand intermediate scrutiny because, as alleged, it is not substantially related to the privacy rights Defendants raise.

To be sure, Whitaker and the Fourth Circuit in Grimm I both acknowledged that bodily privacy is a "legitimate and important interest." Grimm I, 822 F.3d at 723; see also Whitaker, 858 F.3d at 1052 (recognizing that the school district "has a legitimate interest in ensuring bathroom privacy rights are protected"). M.A.B. highlights that Defendants have not offered a factual basis to support their privacy concerns. But on a motion to dismiss, the Court may only consider M.A.B.'s allegations in the Complaint and accept them as true. Albright, 510 U.S. at 268; Lambeth, 407 F.3d at 268 (citing Scheuer, 416 U.S. at 236). M.A.B. does not describe the basis of Defendants' privacy concerns in his Complaint. Unlike in Whitaker, where the court had the benefit of a factual record from which to conclude that the school district's privacy concerns were not "genuine," in this case there is not yet a factual record.

The Court need not assess whether the privacy concerns Defendants raise are sufficiently "important governmental objectives," however. See Virginia, 518 U.S. at 524. Even assuming they are, the Court concludes that the Policy, as alleged, is not "substantially related" to those asserted privacy rights. See id.

The policy in Whitaker was not substantially related to protecting other students' privacy rights. See 858 F.3d at 1052. Defendants attempt to distinguish Whitaker's holding by emphasizing that the policy at issue in that case related to access to restrooms, instead of the locker room access at issue here. Nonetheless, Whitaker's reasoning applies with similar force. No allegations in the Complaint suggest that the High School's boys' locker room is "particularly susceptible to an intrusion upon an individual's privacy." Id. In fact, the boys' locker room here has partitioned stalls for changing clothes and stalls that have toilets and stall doors. (Compl. ¶ 48). And the single-use restrooms Defendants require M.A.B. to change in are available as well. (See Compl. ¶¶ 31, 32, 45).

Like in Whitaker, then, students "who have true privacy concerns are able to utilize a stall" to change in. 858 F.3d at 1052; see also Grimm I, 822 F.3d at 729 (Davis, J., concurring) (observing that if a student objects to using the restroom in the presence of a transgender student, "all students have access to the single-stall restrooms"). Thus, Defendants' argument that permitting M.A.B. to use the boys' locker room amounts to "government compulsion of students to expose their bodies and to be exposed to the bodies of students of the opposite [birth] sex" is misplaced. (See Mem. Supp. Mot. Dismiss at 27, ECF No. 36-1).

The presence of single-use restrooms and stalls in the boys' locker room is not enough to assuage Defendants' privacy concerns. They assert that if M.A.B. changing clothes in the designated restrooms makes him feel humiliated and embarrassed, as well

as alienated from his peers, then students who use those restrooms for greater privacy will feel the same way. Defendants' argument is flawed for at least four reasons.

First, unlike a boy who decides to change clothes in a single-use restroom or stall for greater privacy, barring M.A.B. from changing in the boys' locker room harms his health and well-being. M.A.B. has been diagnosed with gender dysphoria, whose treatment requires "social transitioning." (Compl. ¶¶ 25, 26). This includes accessing single-sex spaces, like locker rooms, that align with his gender identity. (Id. ¶ 25). Barring M.A.B. from accessing the boys' locker room interferes with his social transitioning. Second, Defendants' argument overlooks the very existence of the Policy. It requires M.A.B. to change his clothes in the designated restrooms, against his doctor's medical advice, and M.A.B. risks discipline if he does not comply. Conversely, boys who have privacy concerns have the option of changing clothes in a single-use restroom or stall if they want greater privacy.

Third, their argument further overlooks the entire context surrounding the Policy. It singles M.A.B. out, quite literally because it does not apply to anyone else at the High School, and marks him as different for being transgender. On the contrary, a boy who makes the personal choice to change clothes in a single-use restroom or stall does not experience any such singling out at the hands of his school. See Grimm I, 822 F.3d at 729 (Davis, J., concurring) ("For other students, using the single-stall restrooms carries no stigma whatsoever, whereas for [the transgender plaintiff], using those same restrooms is tantamount to humiliation and a continuing mark of difference among his fellow students."). Fourth, even if some boys feel humiliated, embarrassed, or alienated for

deciding to change clothes in a single-use restroom or stall, changing there still serves Defendants' privacy concerns because those boys still enjoy greater privacy. Defendants do not explain how preventing such ill feelings further the privacy rights of any students.

Because Defendants contend that they may bar M.A.B. from the boys' locker room completely—despite the presence of single-use restrooms or stalls—by implication, Defendants are arguing that the presence of M.A.B. in the boys' locker room—itself—is what infringes on the privacy rights of other boys.[16] Defendants do not provide any explanation for why completely barring M.A.B. from the boys' locker room protects the privacy of other boys changing there, while the availability of single-use restrooms or locker room stalls does not. Nor does the Court find any. M.A.B.'s presence in the boys' locker room "provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates" while they change their clothes. See Whitaker, 858 F.3d at 1052. So, as in Whitaker, preventing M.A.B. from changing clothes in the boys' locker room "does nothing to protect the privacy rights" of students at the High School. See id.

Finally, just as in Whitaker, if Defendants were concerned that children with different-looking anatomies were changing clothes in the locker room together, "then it would seem that separate [locker rooms] also would be appropriate for pre-pubescent and

---

[16] Defendants also dispute whether there are partitioned stalls for changing clothes in the boys' locker room. Because the Court is considering a motion to dismiss, the Court assumes as true M.A.B's allegation that such stalls are present.

post-pubescent children who do not look alike anatomically." Id. at 1052–53. But Defendants have not separated locker rooms in that manner.

The Court, therefore, concludes that the Policy, as alleged, is not "substantially related" to protecting the privacy rights of students at the High School. See Virginia, 518 U.S. at 524.[17]

To conclude, M.A.B.'s claims come down to "a boy asking his school to treat him just like any other boy." Grimm III, 853 F.3d at 730 (Davis, J., concurring). The Court finds that Title IX and the Equal Protection Clause provide M.A.B. grounds to do so. Accordingly, the Court will deny Defendants' Motion to Dismiss.

## C.    Rule 65 Standard of Review

Having considered Defendants' Motion to Dismiss, the Court will now consider M.A.B.'s Motion for Preliminary Injunction.

The Court may grant a preliminary injunction if "specific facts . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed.R.Civ.P. 65(b). The purpose of a

---

[17] For the aforementioned reasons, the Court will deny the Motion as to M.A.B.'s claims under Articles 24 and 46 of the Maryland Declaration of Rights. Generally, Article 24 claims are read in pari materia with equal protection claims, except in limited circumstances when Article 24 may be interpreted more broadly. Ross v. Cecil Cty. Dep't of Soc. Servs., 878 F.Supp.2d 606, 622 (D.Md. 2012) (citing Koshko v. Haining, 921 A.2d 171, 194 n.22 (Md. 2007)). Because the Court denies the Motion as to M.A.B.'s equal protection claim, it necessarily follows that the Court will deny the Motion as to his Article 24 claim, which offers greater protections.

Article 46 "flatly prohibits gender based classifications, absent substantial justification." Giffin v. Crane, 716 A.2d 1029, 1037 (Md. 1998). For the same reasons that Defendants fail to show that the Policy, as alleged, has an exceedingly persuasive justification, the Court concludes that Defendants fail to demonstrate that there is "substantial justification" for the Policy. Accordingly, the Court will deny the Motion as to M.A.B.'s Article 46 claim.

preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." United States v. South Carolina, 720 F.3d 518, 524 (4th Cir. 2013) (quoting In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003)). A plaintiff seeking a preliminary injunction must demonstrate: (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities favors preliminary relief; and (4) an injunction is in the public interest. Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017).

**D.**    **Rule 65 Analysis**

In brief, the Court concludes that M.A.B. has not sufficiently shown that he faces irreparable harm without preliminary relief before the Court issues a decision on the merits.

To demonstrate a clear likelihood of suffering irreparable harm, a plaintiff seeking a preliminary injunction "must demonstrate more than just a 'possibility'" of the harm. Id. The irreparable harm to be suffered cannot be "remote" or "speculative." De Simone v. VSL Pharm., Inc., 133 F.Supp.3d 776, 799 (D.Md. 2015) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991)). Instead, the harm to be suffered must be "actual and imminent." Id. (quoting Direx, 952 F.2d at 812). A plaintiff must be likely to suffer the harm "before a decision on the merits can be rendered." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (quoting 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2810.1 (2d ed. 1995)).

Here, M.A.B. submits that he has demonstrated a clear likelihood of suffering irreparable harm. He is enrolled in physical education class for the 2018–2019 school year, which requires M.A.B. to change in a locker room when classes begin on September 4, 2018. (ECF No. 52). Defendants do not dispute that M.A.B. is enrolled in physical education for 2018–2019, but maintain that M.A.B. is not enrolled in that class for the current school year.

The Court agrees with Defendants. Because M.A.B. is not enrolled in physical education for the current school year, the harm he asserts is not "actual and imminent." De Simone, 133 F.Supp.3d at 799 (quoting Direx, 952 F.2d at 812). What is more, the parties do not dispute that M.A.B. will not need to use a locker room for any other purpose, such as participation in interscholastic athletics. Of course, it is certain M.A.B. will take physical education class when the following school year begins this September. Still, it is "speculative" whether the school year will begin before the Court will issue a decision on the merits. Id. (quoting Direx, 952 F.2d at 812); see Winter, 555 U.S. at 22 (citation omitted). Accordingly, aware that the parties likely hope for a resolution to this case before the following school year, the Court will order the parties to confer and submit to the Court a joint proposed scheduling order.

The Court will, therefore, deny the Motion for Preliminary Injunction without prejudice. M.A.B. may refile his Motion if there is a change in circumstances, and the Court would then set-in preliminary injunction hearing dates scheduled to conclude before September 4, 2018.

## III.    CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion to Dismiss for Failure to State a Claim (ECF No. 36) and deny without prejudice M.A.B.'s Motion for Preliminary Injunction (ECF No. 41).  A separate order follows.

Entered this 12th day of March, 2018

_____/s/_____
George L. Russell, III
United States District Judge